# IN THE MATTER OF THE ESTATE OF JAMES CAMPBELL, DECEASED.

## No. 4159.

May 31, 1963.

TSUKIYAMA, C.J., WIRTZ, LEWIS, AND MIZUHA, JJ., AND CIRCUIT JUDGE HAWKINS IN PLACE OF CASSIDY, J., DISQUALIFIED.

476

478

480

OPINION OF THE COURT BY LEWIS, J.

This suit was brought for the settlement of the accounts of the trustees of the Estate of James Campbell, deceased. The court below found errors in the accounts, in that certain sums constituting corpus had been disbursed as income, and certain sums had been charged against corpus which should have been charged against income or paid by income beneficiaries. The depletion of corpus consequent on these errors, as found, totaled $166,390.70. Judgment was entered on June 29, 1959, ordering corpus restored out of income as set out below.

Four appeals and one cross-appeal were taken to this court from the judgment, to wit: Beatrice C. Wrigley, an income beneficiary of the estate from its inception, entitled to a quarter of the income for life, and seven beneficiaries whom we will call the "Shingle descendants," sometimes referred to as the descendants of Muriel Camp-

bell Amalu,[1] entitled to another quarter of the income (one twenty-eighth each) as successor beneficiaries, appealed:

"From that portion of the judgment which orders the Trustees of the Estate of James Campbell, deceased, to transfer and deduct from the income of the Estate of James Campbell and credit to principal the sum of $166,390.70.

"From that portion of the judgment which directs the Trustees to withhold, during the calendar year 1959, the sum of $39,025.49 from the income of the estate which would otherwise be distributable to Beatrice C. Wrigley.

"From that portion of the judgment which directs the Trustees to withhold, during the calendar year 1959, the sum of $39,055.49 from the income which would otherwise be distributable to the descendants of Muriel Campbell Amalu."[2]

Alice Kamokila Campbell, an income beneficiary of the estate from its inception, entitled to a quarter of the income, appealed in substantially the same language:

From the portion of the judgment ordering the transfer of $166,390.70 from income to principal.

From the portion of the judgment directing the withholding from her income of the sum of $49,284.23 during 1959.

Kapiolani C. Field[3] and Liliuokalani K. Morris, successor beneficiaries whom we will call the Kawananakoa

---

[1] These beneficiaries are children of Muriel Campbell Shingle, who subsequently became Muriel Campbell Amalu.

[2] Though the notice of appeal so reads, actually the judgment was that this sum of $39,055.49 be withheld and transferred in equal annual installments over a twenty-year period commencing with the calendar year 1959.

[3] After the taking of the appeal Kapiolani C. Field died; her estate has been substituted.

descendants, sometimes referred to as the descendants of Princess Abigail Kawananakoa, entitled to a quarter of the income (one-eighth each),[4] appealed in substantially the same language:

From the portion of the judgment ordering the transfer of $166,390.70 from income to principal.

From the portion of the judgment directing the withholding of $39,025.49 from income which would otherwise be distributable to them.[5]

Alan S. Davis, M. L. Randolph and George M. Collins, Trustees of the Estate of James M. Campbell, successors to the trustees whose accounts were presented, appealed from the judgment, without designating a particular part appealed from.

Thirteen minor contingent beneficiaries,[6] for themselves and for the class represented by them, to wit "all other persons not born on December 10, 1951,[7] who upon being born became or shall become similarly situated and there-

---

[4] On May 5, 1945, the then trustees filed in the Circuit Court, First Circuit, a bill for instructions averring that Kapiolani Field was adopted by her grandmother, the widow of the testator, after the testator's death, that a daughter of Liliuokalani K. Lee (now Liliuokalani K. Morris) was adopted by her grandmother, Princess Abigail Kawananakoa, and that by reason of these adoptions the trustees were in doubt as to the shares of income to be paid. The circuit judge decided that these adoptions should be ignored in distributing the income. An appeal to this court was withdrawn, S. Ct. No. 2617. This court has no issue before it concerning this matter and though we speak of those entitled to the income that does not signify any decision thereon.

[5] The judgment was that this sum of $39,025.49 be withheld and transferred in equal annual installments over a twenty-year period commencing with the calendar year 1959.

[6] In this opinion the term "contingent beneficiaries" is used to describe those who are not presently income takers but who may become income takers and may also share in the distribution of the corpus upon the termination of the trust, pursuant to the tenth and fourteenth paragraphs of Testator's will, below set out. This terminology does not connote any decision as to the particular category or legal attributes of the future interest involved. *Cf., Campbell* v. *Kawananakoa,* 34 Haw. 333, 343.

[7] December 10, 1951 was the date of filing of the petition which commenced this proceeding.

by acquire an interest in the estate of James Campbell, deceased," acting by and through Joseph V. Hodgson, their guardian ad litem,[8] appealed:

> "* * * from that part of the 'Final Judgment On Accounts For Period January 1, 1951 - September 25, 1951' entered herein on June 29, 1959, that ordered, adjudged and decreed, and to the extent that said Judgment ordered, adjudged and decreed, that the accounts filed December 10, 1951 covering the period January 1, 1951 to and including September 25, 1951, and all accounts prior thereto filed by the Trustees under the Will and of the Estate of James Campbell be allowed and approved in full without reimbursement of the principal of the said Estate for certain and numerous disbursements or losses of such principal * * *."

For convenience of reference we will identify the issues by numbered headings.

## I. *RIGHT OF APPEAL; ERRORS PRESERVED FOR REVIEW.*

The first questions that present themselves were raised by the guardian ad litem in his briefs as appellee on the several appeals. He contends that the trustees' appeal should be dismissed on the ground the trustees are not aggrieved parties, and contends further that the income beneficiaries have not properly preserved for review any of the points as to the propriety of the charges and distributions disclosed by the accounts and cannot be heard on such points. Moreover, the guardian ad litem contends that none of the income beneficiaries timely presented— that indeed Beatrice Wrigley did not present at all—the various claims of inequity in or lack of authority for the

---

[8] The term "guardian ad litem" as used herein refers to all parties whom he represents.

withholding of income to restore corpus that are argued here. He urges the familiar principle that "an appellate court will consider only such questions as were raised and properly preserved in the lower court,"[9] and contends there has been a waiver by the income beneficiaries of the claim that the court committed error, and that they are estopped to assert such claim.

Consideration of these contentions necessitates review of the record and the situation of the parties.

The income beneficiaries appeared by counsel, but none of them filed an answer to the petition which was filed December 10, 1951 and originated this proceeding. They had been served with chambers summons issued on the petition, and pursuant thereto an answer was required. Alice Campbell, however, filed certain exceptions to the master's report on the 1951 accounts, wherein she sought larger distributions to the income beneficiaries.

Under circumstances not pertinent at this time, the answer of the guardian ad litem was not filed until July 9, 1956. It contained no counterclaim denominated as such, and pursuant to H.R.C.P., Rule 7, no reply thereto was required or allowable unless ordered by the court. There was no such order. Therefore, though the answer of the guardian ad litem in behalf of the contingent beneficiaries attacked various items of the accounts on the ground of unauthorized disbursement or depletion of corpus and prayed that the court:

"(1) * * * examine the said accounts * * *, construe the said will of James Campbell, deceased, and enter

9 This is the general principle. See *Lindeman* v. *Raynor*, 43 Haw. 299, 301, construing H.R.C.P., Rule 46; *Guardianship of Matsuoka*, 45 Haw. 83, 88, 363 P.2d 964, 967; *Bank of Hawaii* v. *Char*, 40 Haw. 463, 467; *Bank of Hawaii* v. *Char*, 43 Haw. 17, 21, *aff'd*, 287 F.2d 51 (9th Cir.); *Guardianship of Ward*, 39 Haw. 39, 46; *Fraga* v. *Portuguese Mut. Benefit Soc'y*, 10 Haw. 128, 130. But there are exceptions to this general principle, as illustrated by *City and County* v. *Tam See*, 38 Haw. 592, 598; *Estate of Enos*, 18 Haw. 542, 548; *Kalaeokekoi* v. *Wailuku Sugar Co.*, 18 Haw. 380, 386.

its decree herein fully correcting the matters in said paragraphs averred by such charges, with interest, against income or against the appropriate share of income or against the Trustees, or all of them, as this Honorable Court shall deem meet, just and proper; * * * and (3) for such further and other relief as the Court shall deem meet, just and proper in the premises" no reply thereto was required and the same stood contested under H.R.C.P., Rule 8(d).

It will be seen that the income beneficiaries were in the position of having admitted the allegations of the petition, but as to the averments of the guardian ad litem, they were in the position of having denied them.

The submitted accounts commenced with the inception of the trust in 1905 and closed September 25, 1951. Except for the accounts for the period January 1, 1951 - September 25, 1951, they all had been previously filed. However, none of them had been settled in any manner binding on the contingent beneficiaries whose exceptions are before us.

It is significant that by the time the case came to trial these accounts were altogether accounts of predecessor trustees.[10] However, the successor trustees appropriately continued the accounting proceeding commenced by their predecessors. Only if there is no successor or surviving trustee does the personal representative of a deceased trustee have the duty of accounting directly to the beneficiaries. 90 C.J.S., *Trusts,* § 383; *Robinson* v. *McWayne,* 35 Haw. 689, 702; *Tucker* v. *Brown,* 20 Wash. 2d 740, 150 P.2d 604, 621. Of course, the personal representative of

---

[10] John Kirkwood Clarke, one of the original petitioning trustees, died December 29, 1951, shortly after the petition was filed, after having been in office since December 14, 1927. James L. Coke, the other of the original petitioning trustees, died August 12, 1957, after having been in office since July 6, 1936. The third trusteeship was vacant from October 29, 1950, when Albert Newton Campbell died, to September 26, 1951, when Alan S. Davis qualified. Albert Newton Campbell had been in office since Apr. 15, 1909.

a deceased trustee is a necessary party in order that his estate may be surcharged. *In re Schepp's Estate,* 9 N.Y.S.2d 112 (Surr. Ct.) ; see also *In re Morrisey's Will,* 170 Misc. 1016, 11 N.Y.S.2d 640, 644.

Beneficiaries must join successor trustees as parties in seeking an accounting for the acts of predecessor trustees. It is for the successor trustees to pursue all proper means of redress. *Gregory* v. *Merchants State Bank,* 23 Tenn. App. 567, 135 S.W.2d 465, 474; *Mitchell* v. *Lenox,* 1 Edw. Ch. (N.Y.) 428 (1833). However, a successor trustee is not personally responsible unless he has neglected to take proper steps in the premises. 1 Restatement, *Trusts,* § 223 (2d ed.) ; 2 Scott, *Trusts,* § 177 at 1311, § 223 *et seq.* (2d ed.) ; *Indian Head Nat'l Bank* v. *Theriault,* 96 N.H. 23, 69 A.2d 226; *Spooner* v. *Dunlap,* 87 N.H. 384, 387, 180 Atl. 256; *State Street Trust Co.* v. *Walker,* 259 Mass. 578, 157 N.E. 334; *Prager* v. *Hart,* 106 Kan. 14, 186 Pac. 1015; *Kendall* v. *De Forest,* 101 Fed. 167 (2d Cir.).

Undoubtedly, a successor trustee may take the position that one or more items in the accounts of his predecessor were unauthorized, or may demand that the personal representative of his predecessor file further accounts. *Cf., Boreing* v. *Faris,* 127 Ky. 67, 104 S.W. 1022. But that was not the position of these trustees. They sought approval of the accounts as filed. At the same time and while defending the accounts, commencing August 31, 1956 after the filing of the guardian ad litem's answer they withheld income from each of two income beneficiaries, Alice Campbell and Beatrice Wrigley,[11] on the ground as stated in a memorandum filed in respect of a motion by Alice Campbell contesting the withholding of her income "that the

---

[11] On advice of counsel, the trustees did not withhold income *pendente lite* from the Shingle descendants or Kawananakoa descendants because "none of the overpayments alleged by said guardian ad litem to have been made were made to said issue * * *."

guardian ad litem has raised questions in the pending proceedings claiming that she [Alice Kamokila Campbell] has been overpaid in the past which claims, if sustained, will result in an order compelling a restoration of corpus or possibly a surcharge."[12] They also, as we have been informed, filed a contingent claim against the estate of James L. Coke, one of the original petitioning trustees, who died August 12, 1957.[13] The personal representative of James L. Coke became a party to the proceeding by an order of substitution entered on June 29, 1959, the day judgment was entered.

To understand the proceedings from and after the filing of the guardian ad litem's answer it is necessary to refer to Alice Campbell's exceptions to the master's report on the accounts, which were filed October 8, 1954. On October 19, 1955, the then trustees moved for summary judgment dismissing these exceptions. This motion came on for hearing on July 9, 1956.[14] At the time of this hearing the guardian ad litem filed his answer and the trustees, Beatrice Wrigley, and the Shingle descendants, who were represented by counsel, were served with the answer. Alice Campbell, though notified of the hearing was not represented. Her attorney had withdrawn. Counsel for the Kawananakoa descendants were not present. According to statements of the guardian ad litem appearing in the

_____

12 Recovery of overpayments, made out of corpus by a predecessor, from income coming into the successor trustee's hands, is one of the means of redress available to a successor trustee. *Estate of Holt*, 14 Haw. 164.

13 We make no holding as to the applicability of the nonclaim statute, R.L.H. 1955, § 317-23. In a proceeding brought by Alice Campbell under the same number, Eq. No. 2388, there was a ruling adverse to the executor of John K. Clarke on that point, but this proceeding was dismissed by the petitioner with prejudice and the matter has not come before this court.

14 On June 14, 1957, the court rendered its decision granting the motion for summary judgment, and in accordance therewith judgment dismissing with prejudice Alice Campbell's exceptions was filed December 6, 1957.

transcript of this hearing, he served the answer on Alice Campbell that same day by serving her attorney in fact, and served the Kawananakoa descendants the next day.

As to some matters, the guardian ad litem's answer touched upon the same subject matter as did Alice Campbell's exceptions. But from a procedural standpoint the guardian's answer entered entirely new ground. It might be a matter of indifference to other income beneficiaries whether Alice Campbell's exceptions seeking larger income distributions were sustained or not, but the guardian ad litem's efforts to establish that past distributions of income had been too large were a different matter, especially since a potential liability on their part was involved.

It again must be noted that when the motion for summary judgment came on for hearing on July 9, 1956, the answer had yet to be served on the income beneficiaries. Nevertheless, at the insistence of the court those present at the hearing on the motion for summary judgment proceeded to consideration of the manner in which the issues raised by the answer would be handled. As a result, it was decided that the guardian ad litem would file specifications of examples in suitable categories illustrating the points raised by his answer, following which memoranda of law would be filed delineating the points not requiring evidence and briefing these.

On August 7, 1956, the clerk notified Alice Campbell's new counsel of the schedule set by the court, which included provision for counsel for the beneficiaries to file memoranda. There is no indication that counsel for the Kawananakoa descendants were notified of this schedule.

On August 11, 1956, the guardian ad litem filed his specifications.

After reviewing the guardian ad litem's specifications, counsel for the then trustees in their memorandum found only three matters which could be covered as pure ques-

tions of law, to wit, the power of the trustees to sell real property, the power of the trustees to sell rock, soil and sand, and thirdly, whether the doctrine of virtual representation barred the guardian from questioning certain legal fees. The guardian ad litem's memorandum raised the further contention that the testator's will "provide[s] for the payment of all costs and charges from income * * *."

On November 30, and December 3, 4, 5, 10 and 11, 1956, the court heard argument on these four points.[15] Counsel for Beatrice Wrigley and the Shingle descendants stated at the time that "we support the position taken by the trustees as to all matters now before the court, and we urge the court to rule in accordance with the arguments and authorities presented by [counsel for the trustees]." Alice Campbell, filing her memorandum after the guardian ad litem filed his, argued the four points. The Kawananakoa descendants filed no memorandum and presented no argument. On the record, they were not called upon to do so.

On May 31, 1957, the court rendered its preliminary decision on the four points argued. The court summarized these points as follows:

"1. What power of sale of land is contained in the Will;

"2. May the Trustees, under the Will, sell sand, rock or topsoil;

"3. May the Trustees charge any expenses to corpus; and

"4. Are the minor beneficiaries barred from now questioning the payment of certain legal fees from

---

[15] At this hearing Alice Campbell's attorney endeavored to argue the matter of withholding income to reimburse principal. The court ruled this was not then involved and that only four questions were then before the court. Counsel for the trustees and the guardian ad litem were in agreement with this ruling.

principal, as previously ordered by the Court, by virtual representation."

The first two points decided by this preliminary decision were incorporated in a judgment of October 17, 1957, which judgment was reviewed by this court in *Estate of Campbell,* 42 Haw. 586, after the guardian ad litem had been allowed an appeal by an order of the court below. On June 20, 1958, this court rendered its opinion, affirming the court below and upholding the Trustees' power of sale. The preliminary decision on the remaining two points is reviewed in the present opinion.

During the pendency of the 1957 appeal no further proceedings were taken with respect to the answer of the guardian ad litem, except in the matter of attorney's fees. Following the remand after the decision of this court on June 20, 1958, the next proceedings which appear of record were on October 13, 1958, when trial commenced. There were present only counsel for the trustees and the guardian ad litem. According to statements of the guardian ad litem appearing in the record there had been a number of conferences between the guardian ad litem and the trustees which had resolved many factual issues. Memoranda were filed in open court setting forth the view of the trustees and guardian ad litem, respectively, as to what were the unresolved issues. These memoranda do not show any prior service, or any service at all on the income beneficiaries.

Evidence was taken on these unresolved issues at sessions held on October 13, 27, and 28, 1958. There also was a stipulation that "the Court may consider as evidence and take judicial notice of certain files in the records of this Court," which were enumerated at the hearing of October 13, 1958. Argument was heard October 28, 1958. The income beneficiaries were not present at any of these sessions.

In December, 1958, counsel for the trustees and the guardian ad litem each served requested findings of fact and conclusions of law upon the other and submitted them to the court. The income beneficiaries were not served. The findings and conclusions of the court were filed January 24, 1959.

We have searched the record of the above-outlined proceedings and can find no point at which the income beneficiaries waived their right to present, or became estopped to present, their position with respect to the sustaining of the accounts.

Since no pleading in response to the guardian ad litem's answer was required the income beneficiaries had not "failed to defend" within the meaning of H.R.C.P., Rule 55(a). See *Bass* v. *Hoagland*, 172 F.2d 205 (5th Cir.); *Klein* v. *Rappaport*, 90 A.2d 834 (D.C. Munic. Ct. App.); *Olsen* v. *Int'l Supply Co.*, 22 F.R.D. 221 (D.C. Alaska). In any event no default was entered.

H.R.C.P., Rule 16, provides that the court may "direct the attorneys for the parties" to appear before it for a pre-trial conference. That was not done. Instead pre-trial commenced during the hearing in July, 1956, on the motion for summary judgment, though the answer raising the issues of unauthorized invasion of corpus had not even been served when that hearing commenced. Following the appeal decided in 42 Haw. 586 pre-trial continued on an informal basis between counsel for the trustees and the guardian ad litem alone.

H.R.C.P., Rule 5(a), provides for service of papers "upon each of the parties affected thereby." That was not done. Rule 6 of the former rules of the Circuit Court, First Circuit, then in effect, provided that service must be acknowledged in writing or shown by a certificate, so that we must assume as we have that no service was made where none is shown.

Rule 24 of said former Circuit Court rules provided that: "The clerk shall, in writing, duly notify the attorneys of the respective parties of the date and hour and before which judge the cases are set for trial. In all such cases the clerk shall retain a copy of such notices." That was not done. The income beneficiaries say they were not notified and the record bears them out. It is manifest from the manner in which the informal pre-trial proceedings were conducted that it was not contemplated that the income beneficiaries would participate in the trial.

The procedure followed after the remand in 1958 is surprising in view of the guardian ad litem's position, at the conclusion of the hearings on the preliminary matters in December, 1956, that "in regard to the future procedure * * * I feel that all parties in interest should be consulted * * *." In this court the guardian ad litem argued that he was not responsible for the procedure followed. Whether that is so or not, the record does not support the contention that the income beneficiaries cannot be heard in this court on the points argued here.

As to the correctness of the accounts, we hold that the contentions preserved for review by the trustees are open to Alice Campbell, Beatrice Wrigley, and the other income beneficiaries in this court. The guardian ad litem will not be prejudiced by this holding, as he had ample opportunity in the trial court to meet all of these points. *Cf., Kalaeokekoi* v. *Wailuku Sugar Co., supra,* 18 Haw. 380, 386. Without attempting to assess the responsibility for the manner in which the case was handled, we have concluded that the income beneficiaries could and did accept the representation of the trustees in the proceedings as to the correctness of the accounts, at least from and after the decision on the interlocutory appeal. Prior to that time, with the possible exception of the Kawananakoa descendants whose case in any event need not rest on the

correctness of the accounts, the income beneficiaries preserved for review the two preliminary issues not covered by the interlocutory appeal.

A further question arises due to the form of Alice Campbell's specification of errors. With respect to the correctness of the accounts the only rulings specified as error were those concerning the fees and expenses paid out of corpus in connection with Equity Nos. 2998 and 3501.[16] Alice Campbell played a part in Equity Nos. 2998 and 3501 which caused the trial court to charge her income in the amount of $10,248.74, the entire amount ordered reimbursed to corpus in connection with this litigation. Hence these matters have been of special interest to Alice Campbell.

Alice Campbell's income further was charged with one-fourth of the amount ordered reimbursed to corpus in connection with various other matters. These matters come before us on the appeals of other parties, and insofar as we find error in these adjustments we necessarily reverse as to the one-fourth assessed against Alice Campbell as well as the remainder, despite the form of her specification of errors. As held in *In re Barnett,* 124 F.2d 1005, 1009 (2d Cir.), "complete reversal is the only proper way to avoid unnecessary complications * * *."[17]

---

[16] These and other cases involved in the accounts will be identified by the numbers assigned to them in the Circuit Court, First Circuit, unless otherwise shown.

[17] The rule, as stated in 3 Am. Jur., *Appeal and Error,* § 1185 at 693, is: "* * * when a decree in equity is entire in its nature, a reversal of the decree on the appeal of one of the defendants operates to reverse the decree as to all of them." Here the judgment was that the trustees deduct from income and transfer to principal $166,390.70. To the extent that it is ascertained that no transfer from income is warranted the trustees are without power to make the deduction from Alice Campbell or any other beneficiary. The spendthrift clause of the will forbids it. This court will not permit such deviation from the will, much less order it. *Cf., Estate of Enos, supra,* 18 Haw. 542, 548. If the direction for reimbursement of corpus falls as to any amount the implementation of the direction necessarily falls with it. See *United States v. City of New York,* 186 F.2d 418 (2d Cir.).

As to the method of relief, the court's findings of fact and conclusions of law, filed January 24, 1959 and amended January 28, 1959, ruled that $166,390.70 should be reimbursed to corpus "out of current or future income." Thereafter, the income beneficiaries were brought before the court by a motion of the trustees, made March 12, 1959, that the court enter judgment.

On March 24, 1959, the Shingle descendants moved to amend the findings of fact and conclusions of law so as not to call for the withholding of "any of the income of these respondents to reimburse the principal of the trust estate for overpayments made to their mother." The Kawananakoa descendants joined in this motion. It was heard on June 1, 1959. In a memorandum in opposition to the motion the guardian ad litem took the position that the movants had waived the contention made by the motion and were estopped to present it, but the court proceeded to hear the motion stating that the court did not want any argument on waiver or estoppel. By an order of June 22, 1959, the motion was denied.

The argument on June 1, 1959 went beyond the motion of the Shingle and Kawananakoa descendants and into the subject matter of the trustees' motion for entry of judgment, that is, the form the judgment would take. On June 29, 1959, the judgment was entered. The judgment differentiated between the amounts ordered withheld from the Shingle and Kawananakoa descendants, on the one hand, and Alice Campbell and Beatrice Wrigley, on the other hand. As to the former there was involved the recovery of sums which had been distributed to beneficiaries now deceased. It was ordered that recovery from the Shingle and Kawananakoa descendants be made in twenty annual installments. As to the latter, who were the original income beneficiaries, the recovery was to be entirely from 1959 income.

The motion of the Shingle and Kawananakoa descendants brought before the trial court the contention of these parties that corpus could not be restored out of the income of beneficiaries who had not received the distributions by which the corpus was depleted. We have no doubt that the trial court could and did permit the contention to be presented by this motion. Such contention has been preserved for review. *Cf., Lalakea* v. *Laupahoehoe Sugar Co.*, 34 Haw. 232.

The guardian ad litem in his memorandum in opposition to the motion of the Shingle and Kawananakoa descendants stated that: "Seemingly they [the movants] were perfectly content to commit their interests to the protection of the Trustees and to have the Trustees represent them," and that they should not "when they found the result not to their liking" be allowed to "reopen and relitigate, at the expense and to the prejudice of parties who did conscientiously appear and participate, issues that were fully litigated * * *." But the record shows that the issue presented by this motion could not have been "fully litigated."

The method of relief was an issue distinct from the issues as to the correctness of the accounts. And since the guardian ad litem sought redress against income or against the trustees in the alternative, it amounted to a conflict of interest for the trustees to represent the income beneficiaries in this matter. Assuming that the trustees might properly argue the impracticability of redress as part of their argument against adjustment of the accounts, nevertheless as to any adjustments finally made it would become the duty of the trustees to seek recoupment from the income beneficiaries in behalf of the contingent beneficiaries unless other and better redress was available. No final conclusion in the matter of recoupment from the income beneficiaries could be reached without their being represented.

At the hearing of June 1, 1959, Beatrice Wrigley made no presentation to the trial court as to the method of relief. Counsel for Alice Campbell argued that, before there could be any withholding from beneficiaries' funds, there must first be a surcharge ordered against the trustees. Upon the argument in this court, this contention was abandoned.[18] Thus these beneficiaries, while not fore-closed from presenting to the court any matter pertinent to the method of relief, did not avail themselves of the opportunity to do so when brought before the court by the motion of March 12, 1959, and have not preserved such matter for review. In any event, their arguments in this court amount to little more than the assertion that restitution has become inequitable after so long a time. That is only one element to be considered. See 3 Scott, *Trusts*, §§ 254.1 and 254.2 (2d ed.); Restatement, *Trusts*, § 254 (2d ed.). Their counsel have urged this court to dispose of their cases "on the present state of the record as to the equities." We find nothing in the record as to any special equities in behalf of these beneficiaries other than the matter of the St. James Hotel, elsewhere con-sidered. There is no inequity to these beneficiaries in the results we have reached.

For reasons already stated we find it unnecessary to consider the argument of the guardian ad litem that, with respect to the long delay in settling the trust accounts, the income beneficiaries are not blameless as they could have forced the settlement of the accounts at an earlier date, or the countervailing argument based on the masters' reports and orders based thereon approving the accounts. And as to the argument that money overpaid to a bene-ficiary cannot be recouped if overpaid due to a mistake

---

[18] The minutes of June 1, 1959 show, though the transcript does not, that at a later point counsel for Alice Campbell "informed the Court that Mrs. Campbell feels there should be no recoupment," but this adds nothing to the point already noted.

of law we likewise find no necessity to consider this contention as, at most, it has to do with the right of a trustee to recoup for his own protection[19] and even if properly preserved would be deemed waived by the abandonment of the contention that the matter of surcharging the trustees must come first, before any recoupment from beneficiaries.

Considering now the appeal of the trustees, it, of course, is well settled that only a party aggrieved by a judgment can appeal from it.[20] It is equally well settled that a trustee is not aggrieved by a judgment which merely determines the rights of one beneficiary or class of beneficiaries as against other beneficiaries,[21] at least when all of them are adequately represented.[22]

In the present case the successor trustees, as parties in the court below, had both a personal interest and a representative capacity. They had a personal interest because of the possibility of being held personally liable. They had a representative capacity because the ultimate question was whether the property in their hands as successor trustees, shown by the closing inventory filed with

[19] See 3 Scott, *Trusts*, § 254.2 (2d ed.).

[20] *Guardianship of Ward*, 41 Haw. 499, 42 Haw. 60, 65; *Pires* v. *Pires*, 29 Haw. 849; *Hawaiian Trust Co.* v. *Holt*, 24 Haw. 212, 215.

[21] *Castle* v. *Irwin*, 25 Haw. 807, 810, *affirming* 25 Haw. 786, 790; *Estate of Walker*, 42 Haw. 220, 43 Haw. 304; *King* v. *Buttolph*, 30 F.2d 769 (9th Cir.), *dismissing appeal* from *Estate of Deering*, 30 Haw. 217.

[22] It is to be noted that the court below ordered the corpus restored out of the income of beneficiaries who neither received the unauthorized distributions of corpus nor benefited by the unauthorized charges against the corpus, and to accomplish the restoration of such distributions ordered transfers from income over a twenty-year period. Some of the beneficiaries affected by this portion of the judgment were contingent beneficiaries at the time of the judgment but now are income beneficiaries, and there may be other such cases in the future. The contingent beneficiaries, other than those represented by the guardian ad litem, though served with the petition did not appear in the court below and were not served with the guardian ad litem's answer. It is questionable whether the possibility that the income of these contingent beneficiaries might be affected in this manner was disclosed by the petition. Possibly

the accounts of their predecessors as of September 25, 1951, was all that it should be. See *Boreing* v. *Faris, supra,* 127 Ky. 67, 104 S.W. 1022.

The trial court found the appellant trustees—the successor trustees—not personally liable. There has been no specification of error attacking this finding so far as the successor trustees Davis, Randolph and Collins are concerned. Nevertheless the trustees had an appealable interest, as now developed.

The right of appeal is to be judged as of the time that right is attacked but without regarding as final adjudications of the court below which have been appealed and on which this court has not yet passed. *Cf., Guardianship of Ward, supra,* 41 Haw. 499. The Shingle and Kawananakoa descendants having appealed, the appeal of the trustees should be judged in that light.

The trial court found a deficiency in corpus of $166,390.70. When the Shingle and Kawananakoa descendants appealed there was reasonable ground for apprehension that the redress ordered by the trial court against their income might fail. The trustees could anticipate that, should there be a reversal of the portion of the judgment directing the trustees to withhold part of the deficiency from these income beneficiaries but not a reversal of the determination of the deficiency itself, then the trustees in their representative capacity would be

the trustees might have appealed to protect the interests of the absent contingent beneficiaries. See Annot., 6 A.L.R.2d 147. However, the point involved has been ably argued on the merits by counsel for the Shingle and Kawananakoa descendants, and the trustees have not argued this matter. Their appeal cannot be justified on the suggested basis.

It is of interest that one of the aforesaid contingent beneficiaries, Edward A. K. Kawananakoa, who during the pendency of the appeal has become an income beneficiary by reason of the death of Kapiolani C. Field, filed an appearance in this court though he did not appear in the court below. He has filed no brief and presented no argument. His counsel has informed the court that he has nothing to present additional to the arguments presented by others. In view of this situation, we will order his appearance stricken without prejudice to his renewal thereof in the court below upon remand of the case.

faced with the possibility of further litigation to obtain other redress for the deficiency by seeking payment from the estates or bondsmen of predecessor trustees.[23] In the usual case this would present no difficulty and no justifiable cause for concern. But in the present case complicated and expensive litigation would ensue. There were involved the accounts of 46 years during which time there had been eight predecessor trustees. Only in one instance had a claim been filed against the estate of a predecessor trustee. Faced with these difficulties the trustees might justifiably feel that the question whether there really was a deficiency deserved further review. Upon consideration of all the circumstances we see no reason why they should not take an appeal and continue in the appellate court their defense of the accounts of their predecessors as a precaution against the possibility of reversal of the part of the judgment directing withholding from income of the Shingle and Kawananakoa descendants.

It must be remembered that this proceeding was not a bill for instructions seeking to have the court "merely * * * direct the action of the trustee[s] for the future * * *." The object was to have the court "pass upon what had already been done." The seeking of instructions for the future conduct of a trust, and the accounting for what already has been done are distinct proceedings. *Hawaiian Trust Co.* v. *Galbraith*, 22 Haw. 78, 81. We are of the opinion that, as in the cited case, this distinction has bearing on the trustees' right of appeal. *Cf., Estate of Holt*, 42 Haw. 129, 132.

That a trustee may appeal if he has a potential liability is clear. See *Estate of Holt, supra; In re Devincenzi's Estate*, 64 Nev. 455, 183 P.2d 831; *Hendrick* v. *Mitchell*, 320 Mass. 155, 69 N.E.2d 466; *American Surety Co.* v.

---

[23] We express no opinion as to the availability of such redress. See Part XIX of this opinion.

*Sperry,* 171 Ill. App. 56, 61. But a trustee's right of appeal is not limited to the case where he already is personally involved. In his representative capacity he has a right of appeal against an order which will involve him in further and expensive litigation against his own best judgment. As stated in 4 Am. Jur. 2d, *Appeal and Error,* § 221, a trustee may appeal from a decree which presents a question as to his right or power to comply with it. *Cf., In re Forney's Estate,* 44 Nev. 279, 194 Pac. 331.

The present case is one in which a party is not aggrieved by the judgment as a whole, but if the judgment is not sustained in the appellate court in its entirety he will have a legitimate interest in reversing a ruling denying him certain relief, the reversal of which will lead to a different judgment or order.[24] For example, when a judgment has been entered n.o.v. it is to the interest of the party who lost the verdict, in the event of reversal of the judgment granted him n.o.v., that the verdict be not reinstated and that a new trial be ordered. Some courts have held that, as appellee, he may cross-assign as error the denial of his motion for new trial. See *Montgomery Ward & Co.* v. *Duncan,* 311 U.S. 243, 254; *Zimmerman* v. *Mathews Trucking Corp.,* 205 F.2d 837 (8th Cir.). Other courts have entertained a cross-appeal. See *Marsh* v. *Illinois Cent. R.R.,* 175 F.2d 498 (5th Cir.); Annot., 69 A.L.R.2d 449, 531. However, insofar as cross-assignments have been permitted without a cross-appeal this is an exceptional situation. Annot., 1 L. Ed. 2d 1820, 1833.[25] Ordinarily a cross-appeal is essential in order that

---

[24] This is not a case in which the trustees would have the opportunity as appellees to pursue the points presented by them in the trial court should there be a reversal of the adjudication contested by the Shingle and Kawananakoa descendants. *Cf., Inter-Island Resorts* v. *Akahane,* 44 Haw. 93, 99, 352 P.2d 856, 46 Haw. 140, 377 P.2d 715.

[25] In any event, the trustees, as appellees brought before the court by the appeals of the income beneficiaries, could not cross-assign error against their co-appellee, the guardian ad litem. See *Maxwell* v. *Adams,* 91 W. Va. 486, 113 S.E. 752, 754. As appellees brought before the court

a party, in the event of reversal of the judgment rendered, may receive other relief denied it in the court below. *Cf., Morley Constr. Co.* v. *Maryland Cas. Co.,* 300 U.S. 185. To say that a cross-appeal may not be taken by a party in that situation because he is not aggrieved by the judgment as rendered is to ignore the point that the judgment as rendered is not final. Such holding only leads to a second appeal immediately after the entry of the judgment on remand in the event of reversal. That protraction of the litigation is not necessary. It is merely necessary to recognize that in some situations a cross-appeal is precautionary and will not be reached if the judgment as rendered stands. After careful review of the peculiar circumstances of this case we have concluded that such is the situation here.[26]

## II. *APPEALS OF THE SHINGLE AND KAWANA-NAKOA DESCENDANTS.*

We now take up the appeals of the Shingle and Kawa-

by the guardian ad litem's appeal they, of course, can defend the accounts from further adjustments but that does not solve their problem as to the adjustments already made by the trial court.

[26] The matter of expenses incident to the appeals is not before us at this time. However, we will outline our approach to that matter in response to a contention made by the guardian ad litem that the trustees personally, and not the trust estate, should pay the expenses incident to the appeals, it being our purpose to clarify statements elsewhere made that there has been no attack on the finding of nonliability on the part of the successor trustees.

As seen, the interest of the trustees as appellants was limited to those matters as to which there was reasonable ground for apprehension that the redress ordered by the trial court might fail by reason of successful appeals of income beneficiaries while at the same time the ascertained deficiency remained undisturbed. That was true as to the adjustments that were charged by the trial court upon the income generally, some of which was income of successor income takers. As to the adjustments that were charged by the trial court upon the income of Alice Campbell alone there has been duplication of argument on the part of counsel for the trustees and counsel for Alice Campbell, and the trustees' action in assuming the burden of argument on these points was unwarranted. It is only in the area indicated that we are in doubt as to the reasonableness of the trustees' actions on this appeal; our reservation in this regard is of no great moment since the trustees, as appellees on the guardian ad litem's cross-appeal, were in court anyway on some of these matters.

nanakoa descendants with respect to the contention that the court erred in ordering that $39,055.49 be withheld out of income otherwise distributable to the Shingle descendants,[27] and in ordering that $39,025.49 be withheld out of income otherwise distributable to the Kawananakoa descendants.[28]

It is contended that, with minor exceptions,[29] the sums involved were paid to Muriel K. Amalu, formerly Shingle, who died March 19, 1951, and to Princess Abigail Kawananakoa, who died April 12, 1945, and were not received by the Shingle or Kawananakoa descendants but instead by the above-named, their respective mothers, who were original income takers. This is the fact, save that in addition to the exceptions listed by these parties and set out in note 29, we have considered certain other matters in connection with Equity Nos. 3501 and 3621.

There was no evidence and there is no finding that the overpayments made to the original income takers were saved and accumulated by them and received by their descendants by inheritance from them. So the trial court's decision was not on that basis. The trial court evidently upheld the contention of the guardian ad litem which was and is that under the testator's will successors taking a share of income take it "subject to such equities as may

---

[27] Specification of Error No. 3 of the Shingle descendants.

[28] Specification of Error No. 2 of the Kawananakoa descendants.

[29] The exceptions consist of the following:

In the case of the Shingle descendants, $30 of court costs incurred for a bill for instructions as to the respective rights of Muriel Amalu's estate and her issue in income accrued but undistributed at the time of her death; and one-fourth of a disbursement of $11 for a transcript of testimony in connection with the appointment of a successor trustee in September, 1951, to fill the vacancy that had existed since October 29, 1950.

In the case of the Kawananakoa descendants, one-fourth of the above-mentioned $11 disbursement.

504

exist against it in favor of remaindermen," and "stand in no better position" than the predecessor income taker who received the overpayments.

Assuming without deciding at this point that the predecessors, Muriel Amalu and Princess Kawananakoa, would have been subject to a charge against their income had they been alive at the time of the judgment, it does not follow that those shares of the income, after they have passed to successors, their descendants, are subject to a charge for the overpayments the predecessors received. Appellants rightly contend that the court below erred in upholding the guardian ad litem on this point.

With the exception of the St. James Hotel, which will be excluded from consideration at this time, the trust res passed to the trustees under the testator's will. The testator provided that his wife should receive one-third of the net income from the realty for life, and further provided:

"TENTH: And the remaining Two Thirds of the net income, rents, issues and profits of and from said realty, during the natural life of my said wife, and, after her death, the entire net sum thereof, shall be by my said Trustees included in one fund with the net income and revenue of and from all my Estate other than such realty, which shall be under their control by virtue of this Will, and such fund shall be by them at stated intervals of not more than six months, divided into as many equal parts as there shall be then *in esse* any of my children by my said wife, and shall be by said Trustees paid to my said children, from and after their respective majority or marriage, share and share alike; PROVIDED that if any of my said children shall decease, leaving lawful issue, such issue shall stand in the place or places of his, her, or their parent or parents in all respects concerning the

division, payment and receipt of the fund herein mentioned; * * *

* * * * *

"TWELFTH: It being my purpose herein to provide a safe and certain income and maintenance for my wife, our children and grandchildren, for and during the period of the trusts hereby established, I do will and direct that * * * the Trustees herein named, and their successors in trust hereunder, shall keep intact my Estate, and administer the same under the name of 'The Estate of James Campbell',—and that the realty thereof, * * * shall be particularly and especially preserved intact, and shall be aliened only in the event, and to the extent, that the obvious interests of my Estate shall so demand.

"THIRTEENTH: The authority of my said Trustees hereunder, shall continue during the natural life and lives of my said wife, and of my children by my said wife, who shall be *in esse* at the date of my decease, and the survivor of them; and, if there shall be *in esse,* at the death of such survivor, any lawful issue of any such child as last aforesaid, then these trusts, and the authority of said Trustees thereunder, shall further continue for the definite term of Twenty Years after the decease of such survivor, PROVIDED any such lawful issue as aforesaid shall live so long, and if not, then for such lesser term and period as he, she or they shall live.

"FOURTEENTH: At the end of the period limited in the last preceding paragraph, said Trustees shall partition, or have judicially partitioned all and singular my Estate among and between such lawful issue of my said children as shall then be *in esse,* (each of such issue taking *per stirpes,* and not *per capita,*) and shall carry such partition into effect by adequate instruments of absolute conveyance."

The trust had its inception July 3, 1905. At that time Princess Kawananakoa and Alice Campbell were of age. The testator's wife died October 31, 1908, about three years after the inception of the trust. Muriel Amalu became of age November 28, 1908, and Beatrice Wrigley became of age October, 1912, legal age then being eighteen years for females.

The will has been construed in a number of cases, of which the guardian ad litem has cited two as pertinent to the point under consideration. The first case cited is *Estate of Campbell,* 36 Haw. 631, 643, which concerned certain items of expense in the 1938 and 1940 accounts. The court said:

"It is apparent from the terms and provisions of the will of decedent, and especially paragraph twelfth thereof, that the dominant intention of the testator was to provide a safe and certain income for his wife and children and grandchildren for and during the period of the trust created thereby. * * * As a vehicle for the accomplishment of his dominant intention, the testator chose a testamentary trust calculated to endure for the life or lives of his children and twenty years afterwards, the principal of which was to remain intact under terms and provisions safeguarding disintegration from within or without."

The second case cited is *Campbell* v. *Kawananakoa, supra,* 34 Haw. 333, 337, which was a sequel to *Campbell* v. *Kawananakoa,* 31 Haw. 500, and involved the application of R.L. 1935, § 4712, now R.L. 1955, § 340-3, authorizing a circuit judge sitting in equity to validate a lease for its full term, notwithstanding prior termination of the trust "if it appears to be for the benefit of the trust estate * * *." The court held that the benefit must be to all classes of beneficiaries, and did not find a benefit to the remaindermen from the leases under consideration. The

court noted that the testator had divided his estate "into two classes, income and corpus, the former to go absolutely to the life tenants during the duration of the trust and the latter to go absolutely to the remaindermen upon the termination of the trust." But at page 343 the court recognized that the grandchildren of the testator were of the class of remaindermen, of whom the first was born March 14, 1903, before the statute in question. The court said:

"* * * Upon the birth of this grandchild there came into existence one of a class of beneficiaries clothed with a future interest vested by the terms of the will of the testator in the corpus of the estate. Upon the subsequent birth of other grandchildren the class opened and they also automatically became members of it. To be sure under the terms of the testator's will the right to the enjoyment of the absolute ownership and control of the corpus is postponed until the termination of the trust. The right itself, however, ceased to be nebulous and merely theoretical and became a reality. Whether it is a vested or contingent remainder it is unnecessary to decide. It is also unnecessary to decide whether it can in advance of the termination of the trust be lawfully disposed of by those upon whom it was conferred. We think, however, that the exercise of this right, whatever its legal attributes, was immune from the interference that was sought to be imposed upon it under the provisions of section 4712, *supra.*"

Nothing in these cases suggests that a grandchild of the testator, while he is a successor income taker during the period of the trust, is to occupy an inferior position whereby, in the event of depletion of the corpus during the lifetime of a predecessor income taker, he becomes obligated to restore the corpus for the benefit of the class of remaindermen as constituted upon the termination of

the trust. On the contrary, it is recognized in these cases that the principal of the trust is to remain intact to provide an income for the grandchildren as well as others. It further is recognized that each grandchild from birth is "clothed with a future interest * * * in the corpus of the estate." Thus the Shingle and Kawananakoa descendants were among those wronged by the depletion of corpus. They were wronged as potential income takers and as potential remaindermen. And when they became present income takers their potential loss became an actual one. That they have sought no redress for their loss cannot turn them from obligees into obligors.

Cited by the guardian ad litem as supporting the judgment is *Bailey* v. *Smith,* 214 Mass. 114, 101 N.E. 62, while appellants cite *In re Brereton's Estate,* 388 Pa. 206, 130 A.2d 453; *Shade* v. *Colgate,* 4 N.J. Super. 356, 67 A.2d 193; and *Welch* v. *Welch,* 235 Wis. 282, 293 N.W. 150. *Brereton* and *Shade* squarely support appellants, while *Welch* supports them by the underlying reasoning of the case. Appellants also cite *Woods* v. *Duval,* 151 Kan. 472, 99 P.2d 804, which involved certificates evidencing fractional interests in oil royalties, inherited by intestate's sister and brother, and upon the sister's death by her son. During her lifetime the sister had collected all the royalties, professing to be the sole heir. Her son, the beneficiary under her will, was held entitled to one-half the royalties free from the trust impressed on his share by the trial court for the recovery of the excess payments made to his testatrix. The case has been criticized[30] but in any event is not apposite to the point now under consideration. Presently we are concerned with the question of withholding of income from successor income beneficiaries who take upon the ending of the equitable life estate of a

---

[30] 54 Harv. L. Rev. 524; Bogert, *Trusts and Trustees,* § 814 (1st ed.), p. 211, n. 22.

predecessor, by gift of the same donor and under the same trust instrument.[31]

*Bailey* v. *Smith, supra,* 214 Mass. 114, 101 N.E. 62, does not support the guardian ad litem. In that case, Helen Meade was one of six nephews and nieces of testatrix. Helen and a brother Willard were the children of William Smith, and the four others were the children of Franklin Smith. Testatrix had established a trust and left the income to William and Franklin, her brothers, one-half to each. Upon the death of both, the income was to be divided equally among the six nephews and nieces. However, when William and Franklin died the income, instead of being divided into six parts, was divided in halves, and Helen and her brother received all the income from their father's half, one quarter each. When Helen died there was accrued income in the hands of the trustees, and the probate judge directed that the income accrued up to the time of her death should be paid to her administrator, while the income accruing thereafter should be paid to her husband and mother, who under Massachusetts law were her "representatives" within the meaning of a clause in the will providing for payment of the income to the nephews and nieces "or their representatives." The probate judge further, as appears from the official reporter's statement of the case, "authorized the trustees to deduct and retain from the amount payable to the administrator of the estate of Helen I. Meade an amount sufficient to reimburse them for the amount paid to Helen I. Meade during her lifetime in excess of a one sixth share, and to deduct and retain from the one sixth part of the

---

[31] We note that under paragraph 10 of the will the successor income beneficiaries took "in the * * * places of * * * their * * * parents in all respects concerning the division, payment and receipt of the fund * * *." This provision did not place the successor income takers in the position of being heirs of their parents or subject to the parents' obligations. It was a provision for *per stirpes* division.

income payable to Willard Pleis Smith [Helen's brother] an amount sufficient to reimburse them for the amount already paid to Willard Pleis Smith in excess of the one sixth share to which he was entitled under the will." (214 Mass. at 118). This decree was affirmed by the appellate court (214 Mass. at 120, 101 N.E. at 63). Though the opinion of the appellate court read alone is somewhat ambiguous, in the light of the probate court decree it is clear that the court did not have before it, and did not pass upon, any question of withholding from the successor beneficiaries.

In summary, we hold that the Shingle and Kawananakoa descendants, successor income takers under the will of James Campbell, cannot be charged with overpayments of which they did not receive the benefit. Considering now the minor items set out in note 29, no sufficient reason has been shown for charging the $30 court costs against corpus instead of against the fund involved,[32] that is, the income accrued but undistributed at the time of the death of Muriel Amalu. This sum must be recovered from the income of the Shingle descendants. Likewise, as to the $11 transcript fee, no sufficient reason has been shown for charging against corpus this ordinary expense of appointing a successor trustee,[33] and this sum must be recovered in part from the income of the Shingle and Kawananakoa descendants, one-fourth from each group, the remainder to be recovered from Alice Campbell and Beatrice Wrigley. This still leaves certain questions that concern the Shingle and Kawananakoa descendants, or some of them, in connection with the expenses charged to corpus as a result of Equity Nos. 3501 and 3621. See *infra, circa* notes 40 and 41.

---

[32] See *Wodehouse* v. *Robinson*, 27 Haw. 602 and other cases cited *infra.*

[33] See *Estate of Hobron*, 24 Haw. 753, and other cases cited *infra.*

### III. *THE DOCTRINE OF VIRTUAL REPRESEN-TATION; LITIGATION CONCERNING THE 1929 LEASES, EQUITY NOS. 3008 AND 3621.*

A. *The Doctrine of Virtual Representation.*

We now take up the fourth point on which the court ruled in the preliminary decision of May 31, 1957. This point was: "4. Are the minor beneficiaries barred from now questioning the payment of certain legal fees from principal, as previously ordered by the Court, by virtual representation."

In the preliminary decision the court ruled that "the invoking of the doctrine of virtual representation * * * is purely a matter of judicial discretion," and held further that it was not "completely satisfied" that there existed such identity of interests as would be required to invoke the doctrine of virtual representation, and that if legal fees had been wrongly charged against corpus that situation "should be corrected unless there would be inequitable results to the income takers overbalancing the equities of the remaindermen." Perceiving no inequity, the court concluded this portion of the preliminary decision by holding: "The Court will not invoke the doctrine of virtual representation, and holds that the minor beneficiaries are not now barred from questioning the payment of legal fees from principal, as previously ordered by the Court, where no order of class representation was had."

As has been seen, this part of the preliminary decision was not brought up for review in 1957. Following trial in 1958, at which time the court had before it as further evidence in this matter only the files in the various cases where the question of virtual representation was involved, the court found: "10. That it would be inequitable to invoke the doctrine of virtual representation in respect of the various, previous cases and proceedings involved in this case, 11. That the living named minors who were

represented by guardians ad litem in the various, previous cases and proceedings involved in this case, did not stand in the same position, at the time of the respective hearings, as all future unborn contingent remaindermen."[34]

Having concluded that the minors and unborn represented by the guardian ad litem in the present proceeding were not barred from questioning payments from corpus ordered in previous proceedings, the court below then reviewed the previous proceedings, determining as to some charges against corpus that they were justifiably ordered and as to others that they were not.

Appellants have cited numerous cases giving binding effect to a court order based on virtual representation of the unborn by those in being.[35] The doctrine of virtual representation is supported by the great weight of authority, and has been recognized in this jurisdiction.[36] We hold that the court below did not correctly apply this doctrine.

The guardian ad litem contends that the court below had discretion to refuse to apply the doctrine of virtual representation, citing 30 C.J.S., *Equity*, § 145, pp. 578-79. As shown by the cases supporting the cited text, it relates to the discretion of an equity court to relieve a suitor of the burden of bringing in all living parties when too numerous, absent from the jurisdiction, or the like. But such cases cast no doubt on the ordinary principle that, once a court has proceeded and its decision has become

---

[34] Findings 8, 9 and 12 were to the same effect.

[35] *Hale* v. *Hale*, 146 Ill. 227, 33 N.E. 858, 867; *White* v. *Campbell*, 316 Mo. 949, 292 S.W. 51; *Groves* v. *Burton*, 125 Ind. App. 302, 123 N.E.2d 204, 208; *John Hancock Mut. Life Ins. Co.* v. *Dower*, 222 Iowa 1377, 271 N.W. 193, 198; *Buchan* v. *German American Land Co.*, 180 Iowa 911, 164 N.W. 119; *McDavid* v. *McDavid*, 187 S.C. 127, 197 S.E. 204; *Ussery* v. *Darrow*, 238 Ala. 67, 188 So. 885, 889; *Garside* v. *Garside*, 80 Cal. App. 2d 318, 181 P.2d 665, 671.

[36] *Makainai* v. *Lalakea*, 30 Haw. 323, 330. However, the rule was held inapplicable in that case due to features not present here.

final, the only question remaining is as to the binding effect thereof. That is the question here. The matter of discretion has no pertinency. The issue is whether the court that ordered the payments from corpus had authority to bind, and did bind, possible beneficiaries not yet born who might become income takers and might take a share of the corpus. If they could not be bound, the court in the former case should not have proceeded at all as they were indispensable parties.[37] If they could be bound and were bound, then under the res judicata doctrine there was no room for the court below to review the orders made in the previous proceedings.

It also is contended by the guardian ad litem that the virtual representation doctrine cannot apply in the absence of an order for class representation. At the time of the various previous proceedings there was no statute[38] or rule of court[39] providing for such order. All living parties were brought before the court in each such proceeding. No order for class representation was necessary under the circumstances. See *Mudge* v. *New York Trust Co.,* 103 F.2d 625, 627 (7th Cir.).

The guardian ad litem further relies on the findings of the court and contends that they have not been shown to be erroneous. The findings of the court in the matter of virtual representation are based entirely on judicial records which in several instances upon the application of correct principles of law rationally forbid the findings made by the trial court, as will be seen. In such instances the findings are "clearly erroneous" within the meaning

---

[37] See *Hoe* v. *Wilson,* 76 U.S. 501; *Mossman* v. *Hawaiian Trust Co.,* 45 Haw. 1, 14, 361 P.2d 374; *Filipino Fed. of America* v. *Cubico,* 46 Haw. 353, 380 P.2d 488; 3 Moore, *Federal Practice,* § 1907 (2d ed.).

[38] Such a statute was enacted by S.L. 1941, Act 258, § 4, which became R.L.H. 1945, § 12407, now R.L.H. 1955, § 335-7.

[39] See H.R.C.P., Rule 23, which took effect June 14, 1954.

of H.R.C.P., Rule 52(a). *Cf., Poka* v. *Holi,* 44 Haw. 582, 583, 358 P.2d 53, *denying rehearing* in 44 Haw. 464, 357 P.2d 100.

We shall review the several proceedings in which it is contended that the minors and unborn represented by the guardian ad litem in the present proceeding were virtually represented and are bound. All of these cases involved the administration of the trust. Clearly, if the particular case was one in which the court could proceed with binding effect it could proceed as well to award fees. But as will appear, whether the present minors and the unborn were virtually represented and are bound depends upon a number of points.

B. *Equity No. 3008.*

Equity No. 3008 has been brought before us by the guardian ad litem's cross-appeal. The court below, upon review of the order made in Equity No. 3008 for payment of fees, held that the charges to corpus made by this order were justified. We affirm on a different ground, namely that the award of fees made in Equity No. 3008 was res judicata under the virtual representation doctrine.

Equity No. 3008 was a bill for instructions filed July 17, 1929. A guardian ad litem was appointed to represent the then living minors. They included some who presently are income takers, while some still are contingent beneficiaries. The minors represented by the guardian ad litem in the present case of course were not then in being. By order of the court in Equity No. 3008 the then guardian ad litem and his attorney were paid out of corpus $2,000 and $13,765, respectively, and it is these payments that are the subject of the cross-appeal.

This proceeding, Equity No. 3008, sought instructions upon three questions: (1) whether the trustees could then make leases, subject to rights under an existing lease and subleases expiring December 31, 1939, for a fifty-year

term from January 1, 1929, not subject to termination if the trust should terminate within the fifty years; (2) whether payments of $200,000 upon the execution of the leases and $200,000 per year during the period January 1, 1929 to December 31, 1939, were corpus or income; (3) whether such payments, if income, were to be distributed to the income beneficiaries at the time when realized by the trustees, or on the other hand ratably over the whole term of the leases, or over the remaining portion of the leases after December 31, 1939, to the beneficiaries entitled to the income during these periods.

In determining the applicability of the doctrine of virtual representation in this and other cases, the turning point is the identity of interests between the minors before the court in the previous proceeding and the minors now before the court but then unborn. As stated in Restatement, *Property,* §§ 182 and 183, for an order to have binding effect as against the future interest of one unborn, the party before the court, deemed to represent the unborn, must sustain such a relationship to the unborn "that an adequate presentation of the legal position of the party would be an adequate presentation of the legal position of the unborn person * * *."

The guardian ad litem contends that the minors he represents and those still unborn are interested "primarily as remaindermen when that class is determined at the end of the trust" while the minors previously before the court were "contingent income beneficiaries." He argues that it was impossible to have virtual representation in the previous litigation because under the will "there was and is no remainderman with an interest in corpus to represent remaindermen who will have such interests at a later time."

In Equity No. 3008 there were before the court the four children of testator, who were the then income takers,

and additionally the following contingent beneficiaries, to wit: three adult children of Princess Kawananakoa; four minor grandchildren of Princess Kawananakoa, great-grandchildren of the testator, three of them children of Kapiolani Field, and one the child of Liliuokalani Morris; three adult and two minor children of Alice Campbell, formerly Alice MacFarlane; eight minor children of Muriel Amalu, then Muriel Shingle; and three minor children of Beatrice Wrigley, then Beatrice Beckley. It was found in Equity No. 3008 that, based on the life expectancy of the youngest of testator's children plus twenty years, the trust probably would continue for 51.66 years from January 1, 1929. The court in Equity No. 3008 added the twenty years because: "There are many young grandchildren of James Campbell, deceased, *in esse* at the present time." The court thus found, responsive to paragraph 13 of the will, that there were grandchildren in being who could be expected to live for this full period of 51.66 years. Under paragraph 14 of the will these same grandchildren having survived to the end of this period would become remaindermen. As seen, these grandchildren were before the court in Equity No. 3008 and were represented by a guardian ad litem. There is nothing whatsoever to show that the minors in this previous litigation were "contingent income beneficiaries" only, or that there was no remainderman with an interest in corpus to represent remaindermen. This argument has its sole support in the North Carolina cases exemplified by *Williams* v. *Hassell,* 74 N.C. 434, holding that under a will constituting as remaindermen only such beneficiaries as should survive the first takers there was no class which could represent the unborn until the first takers died. This North Carolina rule does not represent the weight of authority and we decline to follow it. See Restatement, *Property,* § 184(a) and (c).

The guardian ad litem further contends that children in being at the time of the former litigation were likely to become income takers while those born later would have less chance of being income takers for any substantial period. But this simply suggests that those born later would have less at stake. Those born earlier could hope to benefit from the corpus in two ways, by enjoying the income therefrom during a substantial part of the trust, and by taking it in the end. As we have said, at the time of the former litigation there were children who were not so old but what they could be expected to participate in the distribution of the corpus, as well as to become income takers.

We hold that the unborn were fairly represented in Equity No. 3008 by grandchildren and greatgrandchildren of the testator then in being and before the court who were not income takers at the time, and who were young enough so that there was every likelihood that they would become remaindermen, as well as income takers during the period of the trust. There was an identity of interests; the action taken by the guardian ad litem was not hostile to the unborn; and the decree operated equally on the minors in being and the unborn. All requisites for application of the virtual representation doctrine were met. See Restatement, *Property,* § 183. We now examine the record in more detail.

The first question involved in Equity No. 3008 was the term of the leases. It was the decision of this court (*Campbell* v. *Kawananakoa, supra,* 31 Haw. 500, see also *Campbell* v. *Kawananakoa, supra,* 34 Haw. 333) that the term of the leases was limited to the duration of the trust. Thus the rights of remaindermen were not affected. On the second question involved, it was equally to the interest of the minors in being and the unborn that the $200,000 payments be classed as corpus, since as income some part

or all thereof would go to the then income takers. The guardian ad litem did contend that these payments were corpus. However, this court held they were income; accordingly, the third question was reached, concerning the distribution of the $200,000 payments. Here, again, it was equally to the interest of the minors in being and the unborn that these payments be distributed ratably, not when realized by the trustees. The guardian ad litem did contend they should be distributed ratably, but again did not prevail. The virtual representation doctrine applies.

C. *Equity No. 3621.*

In Equity No. 3621 the trustees sought instructions, after the leases which were the subject of Equity No. 3008 finally were executed, as to the allocation of $85,195.65 of expenses ($6,531.50 for abstracts and surveys, $1,142.15 for printing of leases, and $77,522.00 legal expenses) incurred in procuring the leases involved in Equity No. 3008. These expenses had been charged against the 1931 income of the life beneficiaries, the four children of testator, but after the Bureau of Internal Revenue required amortization thereof over the period of the leases the children demanded of the trustees that they adjust the accounts. The trustees submitted the question whether the expenses should be charged wholly against capital, wholly against income of one calendar year as had been done, or amortized over the period of the leases. As a result of this suit, $88,083.70 was charged to corpus, including expenses of the proceeding for instructions as well as the $85,195.65 as to which instructions were sought. The court below ordered this entire amount restored to corpus. We apply the doctrine of virtual representation and reverse the court below as to this matter.

The bill in Equity No. 3621 was filed August 8, 1935. A guardian ad litem was appointed to represent the then living minors. The minors represented by the guardian

ad litem in the present case were not then in being. Of the minors in being at the time of the 1935 litigation some now are income takers while others still are contingent beneficiaries.

In Equity No. 3621 the guardian ad litem sought amortization over the period of the leases. The circuit judge, however, held that the $85,195.65 should be charged wholly against capital without amortization.[40] On this point, the guardian ad litem had taken a directly adverse position contending that the expenses should be charged to income. We necessarily conclude that the charge to corpus became res judicata. And since the question as to whether income should be charged in a single year or over the period of the leases was not reached by reason of the decision to charge corpus without amortization, consequently any possible question as to a failure of representation on that point became moot. The reasoning set out above as to Equity No. 3008 equally applies here. The charge ordered against corpus in the amount of $85,195.65 pursuant to the question submitted, and in the amount of $2,888.05 for expenses of the proceeding for instructions ($900 as fees of the attorneys for the trustees, $900 as fees of the attorney for the life beneficiaries, $900 as fees of the guardian ad litem, and $188.05 as court costs and other expenses) is res judicata. Our reversal of the court below as to this matter diminishes the amount ordered transferred to corpus by the sum of $88,083.70 ($85,195.65 expenses of the leases plus $2,888.05 expenses of the proceeding for instructions).

---

40 As noted above, the Shingle and Kawananakoa descendants are not entirely correct in their contention that their respective mothers received the entire benefit of the amounts which the court below ordered transferred to corpus. Insofar as the expenses involved in Equity No. 3621 might have been amortized over the period of the leases these appellants may have been benefited by the charge to corpus in Equity No. 3621.

## IV. *LITIGATION CONCERNING SUCCESSOR TRUSTEES, EQUITY NO. 3501, AND NO. 2388, VOLS. III AND IV; PRINCIPLES INVOLVED IN ALLOWANCE OF FEES AND EXPENSES.*

We next will consider Equity No. 3501, which was instituted on May 18, 1934 by Alice Campbell and her daughter seeking removal of all the trustees and appointment of successor trustees. This 1934 petition, among other things, attacked the validity of the appointments theretofore made. These appointments had been made by confirmation by an equity court of nominations made by surviving trustees. The 1934 petition contended that under paragraph 18 of the will confirmation should be by a court of probate jurisdiction, as set forth in the will, notwithstanding lack of jurisdiction of a probate court over trust estates.

A guardian ad litem for minors was appointed in this Equity No. 3501. He filed an answer, believing as he stated in his motion for allowance of a fee that it was "for the best interests of the minor respondents represented by him that a hearing be held on the allegations of the bill." Our review of the record shows that the minors and unborn represented by the guardian ad litem in the present proceeding clearly were virtually represented in this prior proceeding.

Three of the Shingle descendants[41] filed an answer supporting the trustees but taking no position as to paragraph 18 of the will. The trustees and Muriel Shingle (who afterwards became Muriel Amalu) demurred and their demurrers were sustained on September 11, 1934. An appeal was taken but dismissed August 25, 1937 for non-filing of briefs. On September 24, 1937, in Equity No. 2388, on motion duly served on the trustees and the three

---

[41] These three were Muriel Melvia Trotter (now Muriel Melvia Sutherland), Alicia Shingle King, and Fred Campbell Shingle.

Shingle descendants, and after hearing thereon, the court ordered that the guardian ad litem receive from corpus a fee of $500. At about the same time, on oral motion of the attorneys for the three Shingle descendants, the court ordered that these attorneys be paid from corpus a fee of $500.

The court below ordered that Alice Campbell reimburse both these fees to corpus. It was its conclusion that Equity No. 3501 was "unnecessary volunteer litigation" which "should be paid for by the volunteer."

We hold that the order of September 24, 1937 is res judicata with respect to the guardian ad litem's fee. As to the fee paid counsel for the three Shingle descendants, the record does not support a similar conclusion. Evidently the oral motion of the attorneys for the three Shingle descendants was made at the hearing on the guardian ad litem's motion. The order was signed that afternoon. Under the rules of the court there should have been forty-eight hours' prior notice of the motion.[42] As the record stands it appears that there can have been no proper presentation to the court by the guardian ad litem or the trustees on the question of charging this fee to corpus. As a matter of law the fee was not so chargeable and should have been opposed. The rights of minors and those unborn could not be surrendered without investigation by the court. Despite the presumption of regularity we must conclude that there was lacking the deliberate consideration by the court necessary to bind minors and those unborn. See *Lalakea* v. *Laupahoehoe Sugar Co.*, 35 Haw. 262; *Estate of Campbell, supra,* 42 Haw. 586, 610.

We have said that this fee was not properly chargeable to corpus. The principles involved in this and several other matters before us have been set out in the below cited cases, which however do not include instances of

_____

[42] Circuit Court Rules, 1945 ed., Rule 6, then in effect.

litigation between a trustee and strangers to the trust.

The general rule is that each party to litigation must pay his own counsel fees, in the absence of an agreement or statutory authority for recovery thereof. *Mid-Pacific Dress Mfg. Co. v. Cadinha,* 33 Haw. 456, 478; *Jones v. Dieker,* 39 Haw. 448, 456; *Bishop Trust Co. v. Cooke Trust Co.,* 39 Haw. 641, 651; *Welsh v. Campbell,* 42 Haw. 490; *Von Holt v. Izumo Taisha Kyo Mission,* 44 Haw. 147, 355 P.2d 40, *aff'd,* 44 Haw. 365; *Yokochi v. Yoshimoto,* 44 Haw. 297, 307, 353 P.2d 820.

As an exception to this general rule, when litigation is in advancement of, and not in opposition to, the interests of all the beneficiaries of a trust, counsel fees may be allowed to litigants out of the estate. *Evans v. Garvie,* 23 Haw. 694; *Estate of Lalakea,* 26 Haw. 243 at 275; *Estate of Afong,* 26 Haw. 337. Such fees have been allowed and charged to corpus when the construction of an ambiguous will was involved (*Fitchie v. Brown,* 19 Haw. 415, *Estate of Foster,* 34 Haw. 376), when instructions properly were sought as to whether expenditures should be charged against income or corpus (*Valentin v. Brunette,* 26 Haw. 498), and when there was a proper submission of the question whether certain items should be credited to income or corpus (*Evans v. Garvie, supra*). In such case the fee of the trustee's attorney also is to be paid out of corpus. *Estate of Holt,* 42 Haw. 612, 613.

On the other hand counsel fees will not be allowed out of corpus, for example, when the will is not ambiguous and the litigation is the result of the refusal of the fiduciary to do his obvious duty, even though the movant seeking the allowance is the successful litigant (*Estate of Brown,* 24 Haw. 573), or is the result of a vesting order (*Estate of Renjes,* 42 Haw. 151, 168). In a case of litigation unnecessarily caused by the income taker, the fee of the trustee's attorney will be paid out of this bene-

ficiary's income, not corpus. *Estate of Love,* 17 Haw. 484.

Moreover, even when construction of an ambiguous will is involved that does not always warrant payment of attorneys' fees out of corpus as distinguished from income. When the controversy is in regard to the enjoyment of the income and the litigants have no interest in the corpus or have only a contingent interest, no fee is allowable out of corpus. *Von Holt* v. *Williamson,* 23 Haw. 245. In such case the income or share thereof the disposition of which is in controversy should bear the expenses of the suit. *Wodehouse* v. *Robinson, supra,* 27 Haw. 602. And even when the right to the corpus is in litigation, a fee may not be paid out of the corpus when the time for distribution has not been reached and such payment would reduce the income of the life tenant who has no interest in the controversy. *Bishop Trust Co.* v. *Cooke Trust Co., supra,* 39 Haw. 641, 651.

While fees of attorneys have been specifically mentioned above, the necessary disbursements in connection with the litigation are governed by the same rules. *Estate of Foster, supra,* 34 Haw. 376 at 389.

In summary, the first question in this type of case is whether the proceeding was for the benefit of the estate and in the interest of all parties concerned. If it was "the trust estate should bear the costs and expenses, including a reasonable attorney's fee, of all parties affected and brought before the court." The next question, however, is: To what part of the estate should such expenses be charged? That depends upon the circumstances of each individual case. "Where the suit affects the corpus it is reasonable and proper that the corpus should bear such expenses. Likewise where the suit affects the income generally the general income should bear such expenses. If it affects both the corpus and the general income it should be prorated accordingly." When "neither the corpus of

the trust estate nor the general income accrued or to accrue therefrom was affected" then the particular fund affected should bear the expenses of the suit. *Wodehouse v. Robinson, supra.*

The general rules as to the part of the estate to be charged are of course "inapplicable where the testator has by provisions in his will provided otherwise," as by directing that "special expenses, if any" be paid out of gross income. *Bishop Trust Co. v. Jacobs,* 36 Haw. 686. And when the testator has directed that the corpus be maintained intact and that all necessary expenses incurred in the conduct and management of the estate be paid out of income, "it follows that the expenses properly incurred in securing the appointment of a trustee in succession to one who has resigned are necessarily incurred in the conduct and management of the trust estate" and chargeable against income, at least when the expense is neither extraordinary nor unusual. *Estate of Hobron, supra,* 24 Haw. 753.

As we have said, the court below concluded that Equity No. 3501 was "unnecessary volunteer litigation" which "should be paid for by the volunteer." This reasoning would, if such matter were before us, support a charge to the income of the volunteer, Alice Campbell, who as found unnecessarily caused the litigation, for those expenses ordinarily chargeable to some part of the trust estate such as the fees of the trustees' attorney. As stated in *Patterson v. Northern Trust Co.,* 286 Ill. 564, 122 N.E. 55, 56:

> "* * * Where a beneficiary brings a suit against his trustee which is groundless, the solicitor's fees and expenses of the trustee in defending the charge are to be paid out of the share of the complainant in the trust estate and not charged against the estate generally nor a general fund by which co-beneficiaries would have to contribute."

Not only the fees of the trustees' attorney but also other necessary costs of the proceeding must be paid out of the share of a beneficiary who brings a groundless suit, as they cannot be charged against the estate generally or general income. Such costs include the fees and expenses of a guardian ad litem, at least when the minor has no vested right in property under the control of the court. See *Lalakea* v. *Laupahoehoe Sugar Co., supra,* 35 Haw. 262, 296; Annot., 30 A.L.R.2d 1148; *cf., Von Holt* v. *Williamson, supra,* 23 Haw. 245, where the contest concerned the right to the income and the only question was whether the fee was payable out of corpus.

Thus if the matter were open it would have been our ruling that Alice Campbell, the volunteer, must bear out of her income the expense of the guardian ad litem's fee in Equity No. 3501. But the fee of the attorneys for the three Shingle descendants is governed by the general rule that each party to litigation must bear his own expenses. See *Brisacher* v. *Tracy-Collins Trust Co.,* 277 F.2d 519, 524 (10th Cir.). The rule as to unnecessary litigation does not support a charge to the income of the beneficiary who caused the litigation for the fees of the attorneys for other beneficiaries.

The Shingle descendants who filed the answer in Equity No. 3501 took no position as to the meaning or effect of paragraph 18 of the will. The services rendered by their attorney were of no benefit to the estate. It is evident that the filing of this answer, without awaiting a ruling on the demurrers filed by other parties, was motivated by a desire to support the trustees, one of whom was the father of these parties. Though understandable, such action must be held to have been taken by them at their own expense, and the $500 fee must be charged to their income.

We next will consider the 1936 petition filed in Vol. III of Equity No. 2388 (the number assigned to the trust

estate) for the appointment of a successor trustee by reason of the death on October 23, 1935 of Robert Witt Shingle, who had been appointed a trustee in 1916. The surviving trustees nominated a successor trustee and in January, 1936 sought confirmation of their nomination by the court having jurisdiction over the trust estate. The circuit judge reserved to this court two questions having to do with paragraph 18 of the will. This court decided that paragraph 18 was invalid in attempting to confer on "the Hawaiian court having probate jurisdiction" authority that did not pertain to it, *i.e.*, the power of confirmation of a successor trustee, and decided further that the power of nomination by the successor trustees fell with this invalid provision. *Estate of Campbell*, 33 Haw. 799. Following the decision on the reserved questions the circuit judge made his own appointment of a successor trustee, appointing James L. Coke. Thereafter, a motion for counsel fees was filed in Vol. IV of Equity No. 2388 by Charles S. Davis, as attorney for Muriel Shingle (who afterward became Muriel Amalu), Alice Campbell Blickfelt (now known as Alice Campbell), and a number of adult contingent beneficiaries. Another such motion was filed by Frank E. Thompson, attorney for Princess Abigail and two adult contingent beneficiaries.

A guardian ad litem had been appointed for the then living minors, referred to as the "class of remaindermen, or contingent remaindermen, or beneficiaries, which is subject to be added to by the birth of children to the beneficiaries now in esse," the appointment including also representation of "all future remaindermen, contingent remaindermen or beneficiaries not now in esse who may hereafter become members of the aforesaid class of beneficiaries." The guardian ad litem moved for the allowance of a fee for legal services rendered by him.

These motions were noticed to be heard on July 11,

1936 and then continued to July 17, but under date of July 14, 1936 a stipulation was entered into by the guardian ad litem and the four life beneficiaries, including Beatrice Wrigley, whose attorneys, Elvon Musick, a California attorney, and the firm then known as Anderson, Marx, Wrenn & Jenks, had not yet filed a motion. The stipulation provided that subject to the approval of the court an order be entered directing that each of the life beneficiaries be allowed $3,000 out of corpus for attorneys' fees, and that the guardian ad litem be paid $3,000 for his services, also out of corpus. It further was stipulated that "the foregoing allowances shall be inclusive of all fees and items of expense to be paid by the trustees," including expenses of the adult contingent beneficiaries. The attorneys for the trustees at the same time agreed to accept $3,000 for their services.

In the stipulation, Philip S. Ehrlich and Barry S. Ulrich, not Charles S. Davis, appeared as attorneys for Alice Campbell and were allowed $3,000; Mr. Ulrich had appeared in this court for Alice Campbell and adult children of hers, contingent beneficiaries, but only after the filing of briefs.

A proposed form of order was made part of the stipulation and was in fact signed by the circuit judge under the same date, July 14, 1936, and filed together with the stipulation on July 15, 1936. The order was approved by the attorneys for the trustees in behalf of the trustees. It recited that it was made "pursuant to the stipulation" and further recited "the Court being of the opinion that the fees hereinafter allowed are reasonable and should be paid out of the corpus of the trust estate, and shall constitute all the expense for counsel fees, including those of the adult remaindermen * * *," then ordered the payment of five fees of $3,000 each as set out in the stipulation and $3,000 to the attorneys for the trustees, or $18,000 in all.

The court below found in the present proceeding: "That the said stipulation consented to the surrender of the rights of minors and of beneficiaries, yet unborn." It held that the stipulation was ineffective, applying the principle of *Lalakea* v. *Laupahoehoe Sugar Co., supra,* 35 Haw. 262. It concluded that the $18,000 in fees should not have been paid out of corpus and should be restored to corpus out of income, applying *Estate of Hobron, supra,* 24 Haw. 753.

In *Hobron,* decided in 1919, this court held that under a will similar to that of James Campbell the ordinary expenses of appointing a successor trustee were to be paid out of income. The proceedings for the appointment of a successor to Mr. Shingle were not, however, altogether ordinary as we shall have occasion to note. Nevertheless, if the court before ordering the payment of the fees in 1936 had duly considered the matter, it must have perceived that *Hobron* was at least partly applicable. The entire expense should not have been charged to corpus. A substantial part of the work done had to do with the qualifications of the trustees' nominee and the person to be selected as successor trustee. It was in this respect that *Hobron* was applicable.

However, part of the fees was chargeable against corpus. The litigation as to the validity of paragraph 18 was, as in the case of a suit for the construction of an ambiguous will, occasioned by a difficulty created by the testator himself, and the rule of *Estate of Foster, supra,* 34 Haw. 376, applied thereto.

We find no basis in the record for disturbing the order of July 14, 1936 with respect to the fees of the attorneys for the trustees. These services were nearly all rendered in connection with the validity of paragraph 18 of the will. Our review of the record shows that $3,000 was a reasonable fee for the services they rendered in respect of

that phase of the litigation. Accordingly, no part of the $3,000 fee should be allocated to the ordinary services in connection with the appointment of a successor trustee.

Considering now the situation of the guardian ad litem, we note first that the services for which his fee was allowed clearly were rendered by him in behalf of all minors and those unborn. In this instance the order so specified. There unquestionably was an identity of interests. The difficulty is that the guardian ad litem undertook to stipulate the fees of the attorneys for the income beneficiaries and they in turn stipulated his fee, a total of $15,000 to be paid from corpus. The trustees then approved the order based on the stipulation.

The stipulation and the order thereon were signed the same day, and there is absent from the record any indication that a hearing was held or any consideration given to the reasonableness of these fees or the allocation thereof. The record contains information from the work sheets of Frank E. Thompson, filed at the same time as the stipulation and order, stating that 120 hours of library work were done but in other instances merely listing the work done with the dates. The record contains nothing, other than this, by way of proof as to the amounts allowable. The court must have known, since the record plainly shows it, that some of those rendering services had not participated in the proceeding to the extent that the others had. Yet the fee allowed was the same for all of them. The court must have known that in part the services were rendered in connection with the appointment of a successor trustee and were to be considered ordinary expenses. Yet the entire amount was ordered paid from corpus. We have been forced to the conclusion that the court in 1936 relied wholly on the stipulation. Despite the recital in the 1936 order that the court was "of the opinion that the fees * * * are reasonable and should be paid out of the

corpus" the presumption of regularity is rebutted and the order is not binding under the rule of *Lalakea* v. *Laupahoehoe Sugar Co., supra*, 35 Haw. 262, 279. We ourselves will review the award of fees.[43] Though mindful that the allowance of fees by a court should not be disturbed except for abuse of discretion (*Estate of Lalakea, supra*, 26 Haw. 243, 272) we nonetheless do in this instance find such abuse of discretion.

After careful scrutiny of the record made in 1936— there being nothing additional offered in the court below —we have concluded that, of the $15,000 ordered paid to the attorneys for the income beneficiaries and the guardian ad litem, $6,500 was chargeable to corpus. Our reasons are set out in the review of the record which follows. As to the remaining $8,500, it was chargeable to general income or to particular beneficiaries as now explained.

Mr. Davis and Mr. Thompson took the laboring oar for the beneficiaries with respect to the provisions of paragraph 18. The services of each were about seventy-five per cent devoted to the question of the validity of paragraph 18. $2,250 was a suitable fee to each for the services rendered in respect of that matter and accordingly that amount was chargeable to corpus. The remainder, or $750 to each, should have been charged to general income. The fees allowed these attorneys were not excessive.

Anderson, Marx, Wrenn & Jenks filed no brief. There was no necessity that they do so as the matter had been thoroughly briefed; avoidance of duplication of services was commendable. For their services in the matter of paragraph 18 we find a fee of $500 all that can be justi-

---

[43] See *Guardianship of Soga*, 26 Haw. 774, 779; *Estate of Enos, supra*, 18 Haw. at 548; *Atwood* v. *Holmes*, 229 Minn. 37, 38 N.W.2d 62, 11 A.L.R.2d 311 (annotated).

fied; this amount is chargeable against corpus. For their services in presenting to the court the views of their client as to the person to be appointed they should have been paid from general income but on the record before us no more than $1,000 can be deemed allowable for those services. We think that sum is allowable inasmuch as Mrs. Wrigley presented a different view from the others, who favored the appointment of a beneficiary as successor trustee while Mrs. Wrigley pointed out the possibility of conflict of interest. As to the remaining $1,500, the only explanation we can find for this amount is that the client, Mrs. Wrigley, had a California attorney as well. However, this was for her own convenience and was not of benefit to the estate as a whole. This $1,500 was not chargeable to general income and must be recovered from Mrs. Wrigley's own income.

As to Messrs. Ehrlich and Ulrich, we would be at a loss to understand this $3,000 payment were it not for the record in Equity No. 3501, already reviewed, which shows that Mr. Ulrich represented Alice Campbell in that matter, which at the time of the payment now under consideration was pending in this court. Those services, of course, do not support the fee in Equity No. 2388. However, Mr. Thompson's work sheets indicate conferences with and correspondence with Mr. Ehrlich, who was in San Francisco. We will assume that Mr. Ehrlich did furnish necessary services to Mrs. Campbell in connection with the appointment to be made. She was entitled to independent counsel to be paid from general income, as Mr. Davis was primarily the attorney for Muriel Shingle whom he represented as well in Equity No. 3501. Allowing $500 out of corpus for Mr. Ulrich's appearance in this court in the matter of paragraph 18 of the will (as we have said, he filed no brief), and further allowing $750 out of general income for services in connection with the

appointment to be made, we find that the remaining $1,750 must be recovered from Mrs. Campbell's own income.

The guardian ad litem in the 1936 matter filed a short memorandum in this court noting that "counsel for the life beneficiaries have filed able and exhaustive briefs herein * * *." This memorandum dealt only with the construction of the will. That point also was argued by the trustees. Before the circuit judge the guardian ad litem had filed an answer admitting that the trustees had the power of nomination but asserting that their nominee was not qualified because of conflict of interest, a point already made by others. We have concluded that $1,000 for services in respect of the meaning and effect of the will is all that is allowable out of corpus. As to the remaining $2,000, whether this was excessive for the services rendered in connection with the appointment to be made depends upon whether the fee itself was excessive. That need not be determined as none of the persons from whom redress is or may be effected is in a position to question the amount of the fee, they having agreed to it. We therefore treat this $2,000 as a charge to general income.[44]

## V. LITIGATION CONCERNING ALICE CAMPBELL'S BANKRUPTCY, EQUITY NOS. 2998 AND 3086.

We now take up the litigation that arose out of a 1928 adjudication of Alice Campbell as a voluntary bankrupt, made in California. On June 15, 1929 the trustees filed a bill for instructions, Equity No. 2998, stating that they had income in their hands which they desired to pay to Alice Campbell as demanded by her, that the trustee in bankruptcy, one H. B. Hunter, had served a written de-

---

[44] It will be noted that the situation here is different from the situation with respect to the fees of the attorneys for the two surviving beneficiaries. There it was possible to allocate parts of the fees to the particular beneficiaries benefited. Here it is not.

mand that her income be paid to him, and that owing to the conflicting demands they could not with safety proceed without the advice and direction of the court. Principally involved was paragraph 11 of the will, the spendthrift clause.[45] The only persons made respondents were Alice Campbell and H. B. Hunter. The latter filed an answer and cross-bill in which he attacked the trust as an unlawful suspension of the power of alienation and a violation of the rule against perpetuities and asserted the trust was void. Pursuant to the prayer of the cross-bill all the beneficiaries were brought into court and a guardian ad litem for the minors in esse was appointed. These minors were the same grandchildren and greatgrandchildren of the testator for whom a guardian ad litem was appointed in Equity No. 3008, and the guardian ad litem was the same. For reasons already stated, we hold that these minors virtually represented unborn issue, both in the matter of the cross-bill in Equity No. 2998 and also in the separate suit below considered, Equity No. 3086, where the situation was the same.

James L. Coke, who had not yet been appointed a trustee, was attorney for the guardian ad litem and for a number of adult contingent beneficiaries, and filed demurrers to the cross-bill in Equity No. 2998 on their behalf. Demurrers previously had been filed by the trustees and Alice Campbell. The demurrers were sustained on the grounds "the cross-bill attempts to bring in parties who are not interested in the subject matter of the original bill * * *," and "the cross-bill attempts to raise questions which * * * are * * * not germane to the original bill."

The original bill for instructions, having to do primarily with the spendthrift clause, paragraph 11 of the will, continued in litigation between the original parties

---

[45] This subsequently came before the court and was held valid. *Welsh* v. *Campbell*, 41 Haw. 106.

after amendment of Mr. Hunter's answer upon the sustaining of the demurrers. Alice Campbell contended that the bankruptcy court in California had exclusive jurisdiction over the question who should receive her share of the income, she having prevailed on the question in that court. Mr. Hunter had appealed from the bankruptcy court to the Circuit Court of Appeals and it was during the pendency of the appeal that the conflicting demands of the parties caused the bill for instructions to be filed.

The question of jurisdiction raised by Alice Campbell was reserved to this court on December 11, 1930 but not decided; it was returned unanswered with the consent of counsel on March 11, 1931, after the decision in *In re MacFarlane,*[46] 45 F.2d 992 (9th Cir.), holding that the petition seeking to reach Alice Campbell's income in the bankruptcy court must be dismissed for want of indispensable parties, the trustees. On October 15, 1931 the proceeding came to an end by virtue of Mr. Hunter's disclaimer filed with the permission of the bankruptcy court based on the consent of creditors. Thereupon the trustees discontinued the bill for instructions.

Meanwhile, on April 1, 1930, the adult contingent beneficiaries and the guardian ad litem moved the court in Equity No. 2998 for an order allowing fees to James L. Coke, their attorney; the guardian ad litem also moved for a fee for his own services. There was an order of May 1, 1930, reciting that the motions had been heard and evidence taken, "that the services so rendered by said attorney and said guardian ad litem were for the benefit of and in the interest of the entire trust estate of the said James Campbell, deceased, and should be paid out of the corpus of the said Estate," and that fees of $2,500 for the attorney and $1,500 for the guardian ad litem were fair,

---

[46] At the time of the bankruptcy adjudication, Alice Campbell's name was Alice Campbell MacFarlane.

just and reasonable. The order thus made that these fees be paid out of corpus was held erroneous in the court below on the ground that Alice Campbell was to blame for the litigation and the services rendered were for the benefit of and involved only her share of income. We hold that the order of May 1, 1930 is res judicata. We accordingly reverse the court below as to these items.

After the dismissal of the cross-bill in Equity No. 2998 another suit, Equity No. 3086 was commenced on July 11, 1930. This was a petition of Mr. Hunter, the trustee in bankruptcy, claiming one-fourth of the corpus of the bankrupt estate together with the income therefrom. It was the theory of the petition that the trust was void. All of the beneficiaries were brought into court and a guardian ad litem was appointed. Alice Campbell attacked the jurisdiction of the court, but after the above-mentioned decision in *In re MacFarlane, supra,* 45 F.2d 992, filed a demurrer. The trustees and with them, by the same attorney, the life beneficiaries other than Alice Campbell, previously had filed a demurrer, as had James L. Coke as guardian ad litem for the minors and as attorney for certain adult contingent beneficiaries. These demurrers asserted that the petition showed on its face that the trust was valid. A voluminous brief on the question was filed by Mr. Hunter, the petitioner, and thereafter briefs were filed by James L. Coke as guardian ad litem and as attorney for certain adult contingent beneficiaries, A. Lewis, Jr., the attorney for the trustees and the three life beneficiaries other than Alice Campbell, and certain California attorneys on behalf of Alice Campbell. There can be no doubt that a great deal of work was performed. However, there was no decision on the points at issue. On October 15, 1931 Mr. Hunter, the trustee in bankruptcy, caused the suit to be dismissed in the same manner as above noted in connection with the disclaimer in Equity No. 2998.

Following the dismissal of Equity No. 3086, on November 4, 1931, James L. Coke moved for allowance of a fee for his services as guardian ad litem and as attorney for certain adult contingent beneficiaries. This motion came on for hearing on November 9, 1931, evidence was taken, and the court found from the testimony and the record that the reasonable value of these services was $5,000, which the court by order of November 9, 1931 directed be paid from corpus. This charge comes before us on the guardian ad litem's cross-appeal, considered *infra*. At this point we note that in defending the trust against Mr. Hunter's assertions of invalidity Mr. Coke received a total of $7,500, $2,500 in Equity No. 2998 and $5,000 in Equity No. 3086.

A. Lewis, Jr., the attorney for the trustees and for the three life beneficiaries other than Alice Campbell, received for his services in both suits $10,000, also paid from corpus but without court order. One of the problems encountered is the amount attributable to the various services performed by this attorney. The court below allocated $5,000 to each of the two suits "inasmuch as both cases involved substantially the same claims, both had the same parties and both ended at the same time and in the same manner * * *." We are of the opinion, however, that the material question is the amount of services in prosecuting the original bill for instructions in Equity No. 2998 viewed as one matter, and in defending against Mr. Hunter's cross-bill in Equity No. 2998 and his petition in Equity No. 3086, viewed as another matter. In the latter matter the validity of the trust itself was at stake and all the beneficiaries were parties; in the other matter the spendthrift clause primarily was involved and Mrs. Campbell was the only beneficiary who was a party. True, some of the services of the trustees' attorney were rendered in segregating the two matters but this also was in defense

of the trust. From the record we can see that the services of this attorney in defending the trust were at least as extensive and valuable as the services of Mr. Coke in the two cases; as above noted those services were found after hearing to be reasonably worth an aggregate of $7,500. We also can see from the record that the services rendered in connection with the original subject matter of the bill for instructions were minor by comparison. We allocate $7,500 to the services in defending against the cross-bill in Equity No. 2998 and in defending the validity of the trust in Equity No. 3086, and $2,500 to the original matter involved in Equity No. 2998.

The court below ordered reimbursement to corpus of $5,000—the portion of the $10,000 fee which the court below allocated to Equity No. 2998—from income of Alice Campbell. She has appealed. We have reduced the amount to be restored from $5,000 to $2,500, but affirm the order for reimbursement of that amount to corpus from income of Alice Campbell. Certainly there was no benefit to the estate as a whole from the services rendered in connection with the original bill for instructions, amounting to $2,500 of the fee paid, according to our allocation. As we have said, Mrs. Campbell was the only beneficiary who was a party to the bill for instructions, as distinguished from the cross-bill and the petition in Equity No. 3086. The original bill for instructions was not handled as one of general interest, and the expense of legal services in connection therewith could not be paid from the estate as a whole, either corpus or general income. The trustees had a right of reimbursement from the fund involved, Mrs. Campbell's share of the income, since the bill for instructions was necessary in the circumstances.

It further appears that the trustees paid out of corpus $36 for a transcript, $166.84 for information concerning the bankruptcy proceeding, and $91.79 for expenses of the

trustees' attorneys. A part of this was in connection with the subject matter of the original bill for instructions. The court below ordered reimbursed to corpus from Mrs. Campbell's income one-half of the expenses of the trustees' attorneys or $45.90, the $36 transcript fee, and the $166.84 expended for information concerning the bankruptcy. We have not been shown that the sums so ordered reimbursed from Mrs. Campbell's income were not necessary expenditures for prosecuting the original bill for instructions and accordingly we affirm the court below as to these charges.

The guardian ad litem in the present proceeding has sought reversal of the portion of the judgment sustaining the charge to corpus of part of the legal services and expenses rendered in connection with the two suits. Four items are involved: (a) the $5,000 fee of James L. Coke as guardian ad litem and as attorney for certain adult contingent beneficiaries, allowed out of corpus by court order of November 9, 1931 in Equity No. 3086; (b) a fee of $1,968.75 to E. C. Peters, the original attorney for Alice Campbell, for services up to the time of his withdrawal, allowed after a hearing and the taking of evidence in Equity No. 3086, culminating in an order of April 30, 1931 for the payment of this fee out of corpus; (c) so much of the fees of A. Lewis, Jr., attorney for the trustees in Equity No. 2998 and Equity No. 3086, and also attorney for three life beneficiaries in Equity No. 3086, as was not ordered reimbursed to corpus; and (d) the portion of the expenses of this attorney, $45.89 in amount, not ordered reimbursed to corpus.

As to (a) and (b) we hold that the orders of April 30, 1931 and November 9, 1931 in Equity No. 3086 are res judicata.

As to (c) and (d) we affirm the ruling of the court below, except that upon consideration of the appeal of Alice Campbell we have charged to corpus an even larger amount. The court below held in pertinent part that:

"These expenses were properly charged to corpus because they were expended in defending the trust." We agree. 3 Scott, *Trusts*, § 233.3 at 1761-62 (2d ed.) ; Bogert, *Trusts and Trustees*, § 809 at 179-80 (2d ed.) ; Restatement, *Trusts*, § 233g (2d ed.).

But the guardian ad litem argues that the attack upon the trust was caused by Mrs. Campbell by the manner in which she conducted her personal affairs. He contends: "Where an attack on a trust by a third party is invited or caused by a beneficiary, the beneficiary should pay for it."

The litigation was caused by Mrs. Campbell's bankruptcy. The amount of her debts was such that it was the duty of the trustee in bankruptcy to pursue whatever assets he could, not only her right to income but also her right if any in the principal of the estate. When the trustee in bankruptcy sought to reach the principal of the estate by invalidating the trust, all the beneficiaries were involved. The contingent beneficiaries were particularly affected. The testator intended that the trustees provide just such protection of his beneficiaries as was afforded by the trustees' defense of the trust. By paragraph 12 of the will he required that the trustees "keep intact my estate." He intended that during the period of the trust no beneficiary have an alienable interest. *Welsh* v. *Campbell, supra,* 41 Haw. 106. This is not a case to be disposed of on the ground that, but for the folly of one particular beneficiary the whole litigation was unnecessary, hence not for the benefit of the estate as a whole. *Cf., Estate of Love, supra,* 17 Haw. 484. As shown by the spendthrift clause, the testator contemplated that his beneficiaries might be spendthrifts and might need protection against that folly. When this came about in such a way as to involve the entire trust, the trustees' expenses in defending the trust were a charge upon the corpus as in the usual case.

VI. *LITIGATION CONCERNING THE CON-STRUCTION OF THE WILL AT THE INCEP-TION OF THE TRUST, EQUITY NOS. 1488 AND 1561.*

In connection with two proceedings, Equity Nos. 1488 and 1561, which were the subject of appeals to this court decided in 1906 and 1907, *Campbell-Parker* v. *Campbell-Parker,* 18 Haw. 34 and 342, *affirmed* in 1910 *sub nom Hawaiian Trust Co.* v. *Von Holt,* 216 U.S. 367, a total of $5,482.95 was paid out of corpus for expenses. The guardian ad litem contended that corpus should be re-imbursed for these sums but did not prevail in the court below and by his cross-appeal brought these matters before this court.

Under principles already set out these expenses were properly charged to corpus with one possible exception. That is, the sixth question, considered at page 43 of the first cited opinion of this court, involved solely the division of income between testator's widow and her two eldest daughters, Princess Kawananakoa and Alice Campbell. So much of the expense as pertained to this question should have been paid out of the income involved. The widow was a trustee and as such shared the responsibility for this error. By the St. James Hotel transaction corpus has been reimbursed from her property by far more than the amount involved, as will appear. Accordingly there is no occasion for further redress.

VII. *ADDITIONS TO BUILDINGS IN 1917.*

In 1917 the then trustees made certain expenditures for additions to existing buildings owned by the estate, $400 for additions to the Nugent cottages at Hotel and Likelike Streets, and $3,981.81 for additions to the Water-house Trust Company Building, part of the Campbell Block on Fort Street. The court found that the improvements were not permanent in nature; the cottages were

wooden frame buildings and other improvements to the Campbell Block have been amortized on the basis of a twenty-five year life.

These expenditures were made from corpus and not amortized from income. The trial court held that they should have been amortized, and ordered the transfer from income to corpus of $4,381.81. We agree with the trial court that when improvements are not of a permanent nature provision must be made for amortization of their cost out of income. 3 Scott, *Trusts,* § 233.3, pp. 1759-60 (2d ed.) ; see *Estate of Ena,* 30 Haw. 286. As to the character of these improvements, the findings of the trial court necessarily govern as they have not been shown to be erroneous.

Appellants contend that since the Nugent cottages were acquired by the Territory by eminent domain in 1926, their value at that time formed a portion of the condemnation proceeds and thus was returned to corpus. This contention is well taken. The evidence shows that the cottages were similar to other cottages of the Campbell Estate which are being amortized over a twenty-year life. Lacking other evidence, we compute the amount reimbursable from income at 45%[47] of the $400 involved, or $180, and reverse as to the remainder.

As to the additions to the Waterhouse Trust Company Building, the evidence shows that in 1958 the property in question was condemned by the City and County of Honolulu for an off-street parking lot. Up to that time, the improvements were still in use. Though the condemnation proceeding was subsequent to the initiation of the present proceeding that is immaterial. The judgment in

---

[47] This is based on a period of nine years, from 1917 when the additions were made to 1926 when the property was acquired by the Territory, and is computed at 5% per year, no different method of amortization having been shown and there being no evidence of residual value at the end of the twenty-year life.

the present case was rendered in 1959 for reimbursement out of 1959 income. If a portion of the condemnation proceeds was attributable to the improvements in question then corpus already had been reimbursed in the amount of such proceeds, the wrong had been righted to that extent, and there was no occasion for a transfer of that amount from income. In equity "the relief to be accorded by the decree is governed by the conditions which are shown to exist at the time of making thereof, and not by the circumstances attending the inception of the litigation." 19 Am. Jur., *Equity*, § 411. However, the burden was on appellants to show that corpus had been reimbursed for these improvements and the amount of the reimbursement. They did not meet that burden. It appearing that the trustees were in error in failing to amortize these improvements and there being no evidence of reimbursement through the condemnation proceeding we affirm as to the $3,981.81 involved.

### VIII. *SALES OF OLD BUILDINGS AND PIPE.*

On August 21, 1907 the estate realized $99 from the sale of an old building on Hotel Street. The proceeds were credited to income. The court below ordered corpus reimbursed for this amount. We do not consider this matter for the reason that the widow was a trustee at the time and shared the responsibility for the error; by the St. James Hotel transaction corpus has been reimbursed from her property by far more than the amount involved.

On June 4, 1919 an old building at Kapahulu known as the McCallem residence was sold for $65. On September 18, 1919 some "old pipe at Kapiolani Park" was sold for $250. In each instance the proceeds were credited to income. The court found that they were "a part of the original corpus." Appellants do not show any error in this finding. It does not appear that corpus already had been

reimbursed by amortization of the amount involved out of income. Consequently we affirm the order that corpus be reimbursed from income with respect to these items totaling $315.

### IX. *TIMBERING LICENSE, SALES OF FIRE-WOOD AND TIMBER.*

On March 25, 1911 Hawaiian Development Co. paid $250 for a five-year "license and privilege" to timber the land of Kahaualea on the island of Hawaii. As found by the court below "Kahaualea contains old lava flows and clumps of trees in certain areas, some trees being koa and others being the trees usually found in such areas and at varying altitudes."

On February 17, 1917, $5.48 was received from Oahu Railway & Land Co. "for claim in regard to eucalyptus trees removed from Honouliuli during 1916 * * *."

On January 11, 1918, $21.53 was received from Oahu Railway & Land Co., representing "2% on $1,076.58 net in payment for cutting and disposing of eucalyptus trees by the Kunia Dev. Co. on the land of Honouliuli for 1917."

In January and March, 1919, three payments totaling $84.50 were received for firewood cut from property at Kapahulu, Honolulu.

In each of the years 1940 to 1943, inclusive, payments were received from Hawaii Meat Co. for firewood cut from land at Honouliuli and Kahuku, leased for ranching for a term of twenty-seven years from January 1, 1938 with a provision that the lessee should have "the right to cut and remove firewood from said premises upon paying to the Lessors therefor a royalty at the rate of one dollar ($1.00) per cord; the Lessee hereby agreeing that the land shall not thereby be denuded of trees, and that the principles of good forestry and husbandry shall at all times be observed." These payments totaled $1,450.75.

All of these receipts were credited to income. The court below ordered reimbursement to corpus of the full amount above itemized, or $1,812.26, on the ground that proceeds of the sale of trees, timber and timber rights are principal. It was found that neither the trustees nor their lessees or permittees had ever engaged in "tree farming" and that there were not involved any "wild lands" such as those existing in such timber states as Maine and Alabama.

We will consider separately the sales of firewood, cut from the Kapahulu property and under the Hawaii Meat Co. lease. From the character of the Kapahulu property and the terms of the Hawaii Meat Co. lease we must assume that such cutting of firewood had no permanent effect on the corpus outlasting the duration of the trust or affecting the rights of the minors and those unborn represented by the guardian ad litem in the present proceeding. There is no indication that any "timber" trees were involved, or any growth other than such as would rapidly replace itself. See *Liu Kong* v. *Keahialoa,* 8 Haw. 511. We reverse the court below as to the $1,535.25 of firewood proceeds.

Concerning the eucalyptus trees removed from Honouliuli, it appears that this was during the Oahu Railway & Land Co. lease, which testator had made in his lifetime. The lease contained no provision for cutting of trees. It will be noted that the first item was for a "claim," indicating that the trees were removed without permission. Thereafter a 2% royalty evidently was agreed upon. The total involved is $27.01.

The record contains no information as to the permanent effect, if any, of the cutting of these trees. We are at a loss to know the basis of the trial court's findings. However, we affirm for the reason that eucalyptus must be taken to be a timber tree, and in the absence of any

evidence by which to judge the situation differently we must apply the general rule that the proceeds of the commercial exploitation of timber trees are principal of the estate. See *Liu Kong* v. *Keahialoa, supra;* Annot., 21 A.L.R. 1002, 1011; 51 A.L.R.2d 1374, 1379. We note that this general rule is subject to exceptions, as illustrated by the above-cited annotations. Appellants, citing *Bartlett* v. *Pickering,* 113 Me. 96, 92 Atl. 1008, and 5 American Law of Property, § 20.2, urge that we apply a "good husbandry" test. However, we feel that some evidence should have been adduced by which to apply such test. We decline to take judicial notice of all the facts urged upon us and feel that in ruling as we have in respect of the firewood we have gone as far in that direction as is proper.

As to the $250 received from Hawaiian Dev. Co., this was for "license and privilege of timbering land of Kahaualea for a period of 5 yrs. from date as per terms of their offer of Feb. 15th/11 and our acceptance under date of Feb. 21st/11 and modification as per their letter of Feb. 23d, and our acceptance Feb. 28th, 1911." The correspondence setting out the terms is not in the record. Correspondence of an even earlier date was produced by the trustees at the request of the guardian ad litem in another connection, and we must assume this correspondence was available also. The record does not show whether any timber was cut under the license. The only witness on the point was unable to say. We deem the record inadequate to determine the true nature of this item, and must assume what may have been the case, that is, that the $250 was in the nature of a minimum royalty which included the right of removal of trees up to some specified amount without further royalty. If so, this payment should have been credited to principal for reasons already stated. We accordingly affirm as to this item. It is worthy of note that the result might have been different had the

record shown that the $250 was paid for the privilege of entering upon the land under an agreement calling for a further royalty for any timber taken.

### X. *SALES OF ROCK, SAND, CORAL AND SOIL.*

By Exhibit 3 the guardian ad litem collated instances of sales of rock, sand, coral and soil credited to income during the years 1914 to 1943, inclusive, and 1945, also a small amount so credited in 1908. The 1908 sale was during the trusteeship of the widow. For reasons stated in connection with the St. James Hotel transaction, we deem that corpus already has been reimbursed for any error made in regard to this item. We have for consideration the remaining amounts as follows: $6,601.95 derived from loose surface rock or coral removed from lands under lease; $30,736.03 in royalties paid in 1941, 1942, and 1943,[48] pursuant to the Hawaii Meat Co. lease, under terms hereinafter set out; and $6,057.05 derived from other instances of material taken from land under lease— a total of $43,395.03 credited to income.

In 1942, the trustees began making direct sales of these materials in substantial quantities and credited all proceeds thereof to principal. They continued, however, during 1942 and 1943, to credit to income the royalties under the Hawaii Meat Co. lease as well as some other small items. After 1943 there were no such proceeds from leased land, except for a small sale of loose surface rock in 1945, also credited to income. Except for this instance, after 1943 all sales of these materials were credited to principal, and so far as appears were direct sales by the trustees.

Among Alice Campbell's 1954 exceptions to the accounts was one asserting that, of the sales of materials

---

[48] 1941......................$ 3,492.69
1942...................... 19,063.54
1943...................... 8,179.80

credited to principal from and after 1942, 95%[49] should have been credited to income. A decision granting a motion for summary judgment and denying this and other exceptions of Alice Campbell was filed June 14, 1957.

Meanwhile, there were pending the answer and exceptions of the guardian ad litem. Included in the judgment entered October 17, 1957 on the preliminary decision of May 31, 1957, reviewed and affirmed by this court in 42 Haw. 586, was a paragraph overruling the contentions of the guardian ad litem "in so far and only to the extent it is averred and claimed * * * that the trustees have at divers times from the commencement of the trust to September 24, 1951, sold to third parties top soil, rock and sand, being portions of the original corpus of the estate, without authority under the said will." In affirming this judgment and in holding the sales were authorized, this court ruled that "* * * sales of topsoil, rock and sand constitute sales of interests in the lands from which such materials are taken." 42 Haw. at 589. This court did not at the time specifically pass upon the question whether the proceeds of such sales were corpus or income. However, there can be no doubt that the court below was correct when, in its third and final decision on this matter rendered January 24, 1959, it concluded that all of the proceeds derived from the removal of these materials should have been credited to corpus from the inception of the trust. Annot., 18 A.L.R.2d 98, § 8 at 115; *Blakley* v. *Marshall,* 174 Pa. 425, 429, 34 Atl. 564; *In re McFadden's Estate,* 224 Pa. 443, 73 Atl. 927; *Mairs* v. *Central Trust Co.,* 127 W. Va. 795, 34 S.E.2d 742; *Central Standard Life Ins. Co.* v. *Gardner,* 17 Ill. 2d 220, 239, 161 N.E.2d 278, 289; *Martin* v. *Eslick,* 229 Miss. 234, 253, 90 So. 2d 635, 641, *modified on another point,* 229 Miss. 234, 92 So. 2d

---

[49] It was conceded by the exceptions that 5% should be credited to principal. This was called a depletion allowance.

244; *Parker* v. *Riley*, 250 U.S. 66; *Swayne* v. *Lone Acre Oil Co.*, 98 Tex. 597, 86 S.W. 740; *Mitchell* v. *Mitchell*, 151 Tex. 1, 244 S.W.2d 803; *Barnes* v. *Keys*, 36 Okla. 6, 127 Pac. 261; *Franklin* v. *Margay Oil Corp.*, 194 Okla. 519, 529, 153 P.2d 486, 501; but see *Re Wernet's Estate*, 61 Ohio App. 304, 22 N.E.2d 490. We note that the record does not show any "open mines," or any lease providing for such mines, at the time of testator's death. There was nothing specific in the will concerning the disposition of such materials, the power to dispose of them being found in the general power to sell, as above noted. *Estate of Campbell, supra,* 42 Haw. at 589. Such general power of sale does not signify any intent on the part of the testator that the royalties be treated as income. *In re Bruner's Will,* 363 Pa. 552, 70 A.2d 222.

As we have said, the then trustees credited to income the royalties under the Hawaii Meat Co. lease in 1941, 1942 and 1943, while recognizing in 1942 and 1943 their duty to credit to corpus the proceeds of sales made directly by themselves. The Hawaii Meat Co. lease, made in 1940, provided:

"D. That the Lessee shall have the right to take sand, coral rock and other rock from such locations, and subject to such limitations as may be designated by the Lessors, the Lessors hereby agreeing to make such designations from time to time when requested so to do by the Lessee, and remove the same from the premises hereby demised, upon paying to the Lessors therefor a royalty at the rate of twenty cents (20¢) per cubic yard for sand, and fifteen cents (15¢) per cubic yard for rock; * * *"

Since, in the absence of special circumstances, a royalty paid for the taking of rock or the like is a realization from the sale of corpus of the estate, the proceeds must be treated accordingly. We have used the Hawaii Meat

Co. lease as a clear and fairly recent example, but the other instances stand on the same footing.[50]

Appellants argue that the proceeds derived from loose surface rock or coral rightly were credited to income, citing *Pires* v. *Phillips,* 31 Haw. 720, 722. The cited case had to do with the right of a tenant who was impeachable for waste to clear the land of cactus in order to cultivate it for pineapples, it having been pasture land at the time the lease was made. However, the present record presents no evidence showing that the rock and coral here involved were removed to improve the premises for cultivation and we do not consider the point. We must take it that a certain amount of material has been disposed of for no other reason than that it was saleable, calling for payment of the proceeds into corpus. As to the further contention that, because this was loose material, the removal thereof did not damage the surface, this is immaterial. *Ellis* v. *Wren,* 84 Ky. 254, 1 S.W. 440; *Eggborn* v. *Smith,* 114 Va. 745, 77 S.E. 593.

We accordingly affirm as to each of the amounts above considered, a total of $43,395.03.

## XI. *BROKERS' COMMISSIONS.*

By Exhibit 10 the guardian ad litem collated amounts of expenses charged to principal in connection with the purchase and sale of stocks and bonds. These expenses consisted in brokers' commissions, insurance, cables and postage, totaling $7,260.71. There also was an instance in which an old building was sold for $327.50 credited to principal, exception being taken however to the charging

---

[50] Appellants contend that the practice of the then trustees in crediting the proceeds to income if the lands from which the materials were taken were under lease, was derived from early cases such as *Appeal of Wentz,* 106 Pa. 301 (1884) and *Fahnestock's Estate,* 22 Pa. Super. Ct. 63 (1903). We deem it inappropriate to consider this contention, involving as it does the question whether there is a right of redress against the then trustees or their bondsmen, a matter to be considered upon remand of the case as seen *infra.*

to principal of the auctioneer's commission and cost of advertising the sale amounting to $48.05. The trial court concluded in pertinent part that "these are expenses in connection with sales of principal assets and hence are properly chargeable to principal as a matter of trust law * * *." The matter comes before the court on the guardian ad litem's cross-appeal.

We start with the premise that "* * * the cost of effecting sales, exchanges or acquisitions of any part of the principal, are payable out of principal." Restatement, *Trusts*, § 233(f), p. 559 (2d ed.).

In 3 Scott, *Trusts*, § 233.3, p. 1756 (2d ed.) it is stated:

"There is a difference of opinion on the question whether brokers' charges and other expenses incurred in changing investments should be paid out of income or out of principal. * * * It would seem, however, that they should be chargeable to principal, since they are a part of the cost of purchase or sale.* * *"

Likewise, in Bogert, *Trusts and Trustees*, § 803, pp. 142-43 (2d ed.) it is stated:

"While it may be argued that the costs of selling and buying trust investments are ordinary features of normal trust administration and should therefore be met from trust income, a view which has met with some acceptance, the decisions and statutes generally require their payment from trust capital. * * *"

There is little case law on the point,[51] probably because of the considerable number of states which have adopted the Uniform Principal and Income Act. Under section 12 of that act (section 13 of the revised act) the cost of in-

___

[51] Allowing expenses of sale out of principal are *In re Schepp's Estate, supra*, 9 N.Y.S.2d 112; *Patterson* v. *Old Dominion Trust Co.*, 156 Va. 763, 159 S.E. 168. Allowing expenses of sale out of income are *Jordan* v. *Jordan*, 192 Mass. 337, 78 N.E. 459; *Sedgwick* v. *Sedgwick*, 74 Ohio App. 435, 59 N.E.2d 611. However, the latter case rests upon authorities holding that premiums should be amortized, and consideration of the fund to be charged for expenses of sale appears to have been merely incidental.

vesting and reinvesting principal is chargeable against principal. This appears to be a codification of existing law. Bogert, *The Revised Uniform Principal and Income Act,* 38 Notre Dame Lawyer 50, 57.

Some states hold that where a change of investment is of benefit both to the income beneficiary and the remainderman the expense thereof should be apportioned between them. *Hite* v. *Hite,* 93 Ky. 257, 20 S.W. 778; *Rhode Island Hosp. Trust Co.* v. *Waterman,* 23 R.I. 342, 50 Atl. 389. In the last cited case it is further stated that where a change of investment "becomes necessary without special benefit.to either, and so is incidental to the administration of the trust, it should be charged to income." We do not find this a practical rule and do not adopt it. At the same time, we note that the charging to principal of expenses of reinvestment is not a rule of rigid application. It is a starting point for consideration of the question. Circumstances may call for a different result. In the present case there is no evidence calling for any departure from the general rule and we affirm the holding of the court below.

## XII. *LAND COURT REGISTRATION AND SUB-DIVISION.*

By Exhibit 11 the guardian ad litem collated amounts of expenses incurred for land court proceedings for registration or subdivision of lands, totaling $95,105.54 charged to principal. The trial court concluded in pertinent part: "Land Court proceedings are actions in connection with the gathering in and defense of trust properties and hence are properly chargeable to corpus." Again, the matter comes before the court on the guardian ad litem's cross-appeal.

As to the expense of land court registration, this is an accepted charge against principal. Thus in *Estate of Ena,*

*supra,* 23 Haw. 335, it was held that commissions on moneys so expended, if allowable, would properly be charged to and paid out of principal, not income. As to. the expense of land court proceedings to subdivide lands, this manifestly is chargeable to principal. There is nothing to show that any of these proceedings was unjustified. We find no error.

## XIII. *CONDEMNATION PROCEEDINGS.*

By Exhibit 12 the guardian collated amounts of expenses incurred in connection with condemnation proceedings in which trust lands were taken. These expenses, including one item set out in another exhibit, totaled $241,229.93 charged to principal as compared with $1,067,911.38 received and credited to principal. The trial court concluded in pertinent part: "Expenses incurred in condemnation actions are expenses of the sale of the property and hence are chargeable to corpus by the ordinary principles of trust accounting." We affirm for the reasons so stated by the trial court.

## XIV. *PROCEEDINGS FOR THE SALE OR EXCHANGE OF PROPERTY, EQUITY NOS. 2223, 2401, 2533.*

A petition was filed by the trustees in 1919, Equity No. 2223, for authorization to sell unproductive property at Diamond Head. In 1921, Equity No. 2401, the trustees petitioned for leave to sell certain real property to the United States for a road, the petition alleging that otherwise the United States would condemn it and alleging further that the building of the road would benefit other estate property. In 1923, Equity No. 2533, a petition was filed for authority to exchange property with another private owner so as to make the best use of irregular parcels left by extension of a certain city street. The

sums of $640.25, $600.00 and $455.25 respectively, were paid from corpus for the expenses involved in these proceedings, including fees of the attorneys for the trustees and the respective guardians ad litem. Since these expenditures were not all covered by court order we will not go into the matter of virtual representation. We affirm the ruling of the court below that these expenses "were expenses of the sale or conversion of assets of the trust and, as such, were expenses which, by the ordinary principles of trust law, are chargeable to principal." The rule stated by the court below is the general rule, applicable in the absence of special circumstances.

However, Equity No. 2223 requires further comment. The guardian ad litem contends that this proceeding was "clearly a case in the interest of only income beneficiaries since, according to the averments, its purpose was to sell unproductive land so the proceeds could be invested to yield income of the beneficiaries." Appellees argue that this proceeding "must have been in the interest of all the beneficiaries and the estate or the court would not have authorized the sale * * *." The court below accepted this contention;[52] it gave as an additional reason for its holding: "The litigation was in the interest of all the beneficiaries." We must take it that this was so since, under paragraph 12 of the will, realty of the estate could be sold "only in the event, and to the extent, that the obvious interests of my Estate shall so demand."[53] That meant

[52] The parties have argued at various times that a particular expenditure was of benefit to all the beneficiaries and in defense of the trust property. At times the trial court, as in the matter under consideration, accepted this contention as an additional reason for charging capital. The guardian ad litem, on the other hand, argues that the burden of protecting the trust property for the benefit of all the beneficiaries falls on income, as in the case of insurance. We have taken each issue on its merits.

[53] The petition in Eq. No. 2223 contained, in addition to the averment that "it is in the best interest of the estate that the said tract be sold and the proceeds of sale invested so as to yield income for the benefit of the cestuis que trustent," allegations that the land in question "is

the interests of the estate as a whole, as held in *Campbell v. Kawananakoa, supra*, 34 Haw. 333, 336, construing the amendment made by S.L. 1933, c. 194, which provided for approval of a lease to extend beyond the duration of the trust "if it appears to be for the benefit of the trust estate * * *."

Whatever the result might be if assets in which the trustees had invested became unproductive and a reinvestment was made, we are satisfied that the expense of a court proceeding to obtain approval of the sale of land under an authorization contained in the will, in order to convert into productive assets unproductive property left by decedent, for the benefit of the estate as a whole, is a proper charge against principal. This is analogous to the expense of a proceeding for the construction of the will.

## XV. *BLIGHT OF SUMMONS DAMAGES.*

In one of the condemnation actions the trust received so-called blight of summons damages in the amount of $811.20 credited to income. The guardian ad litem excepted thereto but the trial court held that such damages "are in effect an interest charge upon the amount recovered in the condemnation action for the period from the filing of summons to the date of judgment, and had the government paid the amount of judgment on the date of filing of the action, the interest earned would have been credited to income."

Blight of summons damages are paid because the property "is presumed to be taken as of the date of summons and its value is calculated as of that date." Since

---

largely unproductive and yields only a nominal income, out of all proportion to its area and the value to which it might attain by the expenditure of a large sum of money"; further, that efforts to lease the tract had been unsuccessful, and a certain corporation which had offered to bid on the land would not lease it because of the large expenditure entailed in making the land suitable for use.

payment is not made on that date, in order to compensate therefor the condemning authority must pay interest, subject to a set-off for rents received, so as to put the property owner in the same position as if payment had been made contemporaneously with the summons. *State v. Coney,* 45 Haw. 650, 372 P.2d 348; *reh'g den.,* 46 Haw. 50, 373 P.2d 903. We agree with the trial court's holding that such blight of summons damages are a proper credit to income and affirm the ruling.

XVI. *INCOME TAXES CHARGED TO PRINCIPAL.*

By Exhibits 1 and 13 the guardian ad litem collated amounts of income taxes charged to principal, totaling $110,001.41 over and above countervailing receipts. The nature of these items and the conclusions of the trial court thereon appear from the following:

"A. Receipts from sales of sand, soil and rock are principal and hence as a matter of trust law are properly retained by the trustees, and since this gives rise to the tax in question on those receipt items, such expense is part of the expenses of sale and properly chargeable to corpus.

"B. Capital gains on sales of trust assets are properly creditable to corpus and the capital gains tax thereon is properly chargeable to corpus.

"C. Improvements erected by lessees on premises of the estate are part of capital, and income taxes levied thereon are hence properly chargeable to corpus.

"D. The expenses of the litigation for the recovery of these last taxable items being litigation waged in the defense of the trust in an attempt to gather in trust assets, and for the benefit of principal, are properly chargeable to principal."

The guardian ad litem has appealed these rulings. We

affirm the court below. *Wilcox* v. *Wilcox,* 26 Haw. 219, 233; Restatement, *Trusts,* § 233f (2d ed.); 3 Scott, *Trusts,* § 233.3 at 1755 (2d ed.); Bogert, *Trusts and Trustees,* § 807 at 165 (2d ed.).

XVII. *ARGUMENTS BASED ON CONSTRUCTION OF WILL; MAGNITUDE OF AFFAIRS; RECURRENCE OF ITEMS; PREVIOUS MASTERS' REPORTS.*

A. *Construction of Will.*

In the preliminary decision of May 31, 1957 the court below denied the contention of the guardian ad litem that, under the terms of the particular will, none of the expenses should be charged to corpus. As seen, except in a few instances we have attached no special significance to the will in determining the questions presented. We here state our reasons.

The arguments of the guardian ad litem are based on paragraph 12 of the will which provides that the estate shall be kept "intact" in order to provide "a safe and certain income and maintenance" for the widow, children and grandchildren of decedent; on paragraph 8 which provides that the trustees shall "hold, manage, control, preserve and direct" and shall pay "all costs and charges" of the property distributed to them; and on paragraph 10 which provides for distribution of "the net income, rents, issues and profits" from the realty and the "net income and revenue" from the rest of the estate. We see nothing therein, or in the cited cases concerning this estate,[54] that would cause a deviation from the ordinary principles of trust accounting. See *Valentin* v. *Brunette,* 26 Haw. 417; *Hopkins* v. *Austin State Bank,* 410 Ill. 67, 75, 101 N.E.2d 536, 541.

---

[54] *Estate of Campbell, supra,* 33 Haw. 799, 802, 807; *Campbell* v. *Kawananakoa, supra,* 34 Haw. 333, 341, 342-43, 345-47; *Campbell* v. *Kawananakoa, supra,* 31 Haw. 500, 507; *Estate of Campbell, supra,* 36 Haw. 631, 636; and *Estate of Campbell, supra,* 42 Haw. 586, 589.

The cases cited on the meaning of the word "intact" do not support the proposition that this expression calls for a deviation from the ordinary principles of trust accounting under which certain expenditures are chargeable to corpus, in the absence of a direction for payment of all charges out of income or other specific provision calling for such deviation.

In the present case the stated purpose of keeping the estate intact was to provide "a safe and certain income and maintenance," which surely would not result if there were transferred to income the charges ordinarily made to corpus. Moreover, the word "intact" is explained in what follows in paragraph 12, it there being provided that the trustees "shall keep intact my Estate, and administer the same under the name of 'The Estate of James Campbell,'—and that the realty thereof * * * shall be particularly and especially preserved intact, and shall be aliened only in the event, and to the extent, that the obvious interests of my Estate shall so demand." *Cf., Bowman* v. *Austin,* 393 Ill. 593, 67 N.E.2d 168.

We cannot agree with the guardian ad litem that the direction in paragraph 8 to pay "all costs and charges" meant that all of them were to be paid from income, or that the direction in paragraph 10 to distribute "net income" referred only to such income as was left after paying all costs and charges. In *Bishop Trust Co.* v. *Jacobs, supra,* 36 Haw. 686, 690, the will authorized the trustee, in its discretion, "to withhold a reasonable portion of the income from time to time for the purpose of making repairs and replacements, and likewise * * * to determine the proportion and mode in which special assessments and taxes for street improvements and other special expenses, if any, shall be borne as between capital and income," the will continuing with a provision that the trustee "shall also have authority to pay all expenses of maintenance

558

and management of said buildings, interest, insurance, trustee's commissions and special expenses, if any, and shall pay and distribute the net income either quarterly or monthly * * *." The court interpreted this further provision as one for payment of "special expenses" out of gross income; it was so situated in conjunction with other provisions as to call for that result. The present case is not the same.

B. *Magnitude of Affairs; Recurrence of Items.*

The guardian ad litem has argued that the principle of charging recurrent expense to income should be applied to the matters brought before the court by the cross-appeal, particularly in view of the magnitude of the estate, described as "a big landed trust of long duration,—a great enterprise." The description is apt, but does not lead to the conclusion sought. Consideration of the character of the enterprise may be merited, for example in connection with the "open mine" or "wild land" doctrines, and may lead to the characterization as ordinary income of revenues otherwise creditable to capital, as well as changing the character of the related expenditures. Nothing of the kind is involved here. *Cf., Newman* v. *Newman,* 129 Misc. 784, 223 N.Y. Supp. 488.

We have concluded that consideration of the recurrence of expenditures is only an aid in determining their nature, not a test in itself. We particularly have considered the recurrence of expenses of purchase and sale, for we realize that as reinvestments are made the charging of such expenses to capital might have the effect of depleting capital for the benefit of income. That would be a matter of concern. There is no evidence that anything of the kind has resulted here.

C. *Previous Masters' Reports.*

Appellants have placed much emphasis on the argument that, from the inception of the trust, accounts were

regularly rendered and referred to masters. It is contended that the court's orders approving the accounts upon the recommendations of the respective masters should not be disturbed after so long a time. The guardian ad litem calls to our attention that the early accounts were filed in the probate court, which had no jurisdiction, and that the instant proceeding was the first in which contingent beneficiaries were brought before the court to settle the accounts.[55] Appellants concede, as perforce they must, that the previous court orders are not binding. *Robinson* v. *McWayne, supra,* 35 Haw. 689, 707; *Estate of Allen,* 35 Haw. 501, 537; *Estate of Lalakea, supra,* 26 Haw. 243, 253.[56]

R.L.H. 1955, § 340-4, enacted by Act 101, S.L. 1915,

[55] In *Estate of Campbell, supra,* 36 Haw. 631, involving the 1938 and 1940 accounts, only the life beneficiaries were before the court.

[56] Though masters' reports and orders made thereon are not binding when the parties concerned were not before the court, such reports and orders may perhaps be relevant to other questions. However, the court found in the present case that there had been no showing of neglect on the part of the "present trustees"; there has been no specification of error attacking this finding so far as Trustees Davis, Randolph and Collins are concerned. As to predecessor trustees, their liability is not being considered at this time. Accordingly, we do not pass upon the question whether masters' reports and the orders made thereon may serve as precedents for practices of the trustees when the parties were not before the court when those orders were made. *Cf., Estate of Bishop,* 36 Haw. 403, 425. Nor do we pass upon the right of successor trustees to rely upon the accounts of their predecessors without investigation. *Cf., Spooner* v. *Dunlap, supra,* 87 N.H. 384, 180 Atl. 256; *Indian Head Bank* v. *Theriault, supra,* 96 N.H. 23, 60 A.2d 226. Further, since the contingent beneficiaries whom the guardian ad litem represents are minors and those unborn, there is no issue of laches and the effect in that connection of masters' reports and orders made thereon need not be considered. As to the income beneficiaries who have been overpaid, the asserted inequity to them has not been preserved for review and in any event does not appear, even if we assume that they had a right to rely on the masters' reports and the orders made thereon.

We note further that masters' reports and the orders thereon may be relevant to the question of burden of proof when, as here, the accounts come on for final settlement and exceptions are taken. *Estate of Baker,* 34 Haw. 263, 267. But the masters' reports and orders thereon for the first sixteen accounts were in the probate court which had no jurisdiction. In other instances in which the burden of proof has been involved we have not found that the masters' reports or orders had any special significance under the particular circumstances.

does not provide for settlement of the annual accounts of trustees in such manner as to make the orders entered thereon res judicata, and we need not determine the applicability of this statute to the Campbell Estate. Nor need we determine at this time whether the last sentence of paragraph 17 of the will[57] has any validity in view of the reference therein to "the Hawaiian Court having probate jurisdiction." *Cf., Estate of Campbell, supra,* 33 Haw. 799. We have no issue before us as to the right or duty of the trustees to make final settlement each year of their accounts.

The record on appeal does not disclose the form of bond of any of the trustees who have held the office of Campbell Estate trustee from time to time. That is a matter which may be of concern upon the remand of this case. We deem it important to note that the bond of any trustee under the jurisdiction of the equity court should be such as to hold the surety accountable until the final settlement of the accounts of the trustee. The surety in turn should have a right to final settlement of such accounts when the trustee resigns, is removed, or dies in office.

It is remarkable that, from the inception of the trust July 3, 1905 to the filing of the petition herein December 10, 1951, none of the accounts were brought on for final settlement. In this period of over forty-six years five trustees died in office and one became incompetent and was removed.

---

[57] Paragraph 17 reads:

"SEVENTEENTH: I direct that my Trustees shall furnish to each beneficiary, devisee and legatee hereunder, during the month of January in each year, a complete and detailed account and statement of the receipts, expenditures, transactions, assets and liabilities of my said Estate, for the preceding year, which shall be known as their Annual Report. A copy of such Report shall be filed with the Hawaiian Court having probate jurisdiction, and such account shall be subject to approval, modification or surcharge by such Court, upon legal notice to all concerned."

A master examining an account which discloses that it is the last account of a particular trustee should inform himself as to the terms of the trustee's bond and advise the court as to this and all other pertinent circumstances, in order that the court may determine whether the accounts of this trustee should be brought on for final settlement without awaiting the termination of the trust. The master is not merely an auditor. If his examination discloses errors of law or other errors on the part of the trustees this too may occasion a final settlement of the accounts without awaiting the termination of the trust. One of the principal functions of a master is to assist the court in this regard. Just as a land court examiner reports to the court the matters in doubt and the persons to be cited so also should a master assist the chancellor with respect to trustees' annual accounts. If the masters who examined the accounts now under review had performed their work with the thoroughness, ability and knowledge of the law demonstrated by the guardian ad litem herein the situation that confronts us would have been avoided, but regretably that has not always been the case.

## XVIII. *ST. JAMES HOTEL.*

Included in decedent's assets at the time of his death was the St. James Hotel in San Jose, California. On the theory that this was an asset of the trust estate which was too long retained, the guardian ad litem sought restoration to corpus of the difference between the amount for which it was sold in 1916 and its original inventory value. The court below held that no abuse of discretion had been shown and that in the absence of a showing of abuse of discretion the guardian ad litem's claim was without basis. The guardian ad litem brought the matter before the court by his cross-appeal. We called to the

attention of counsel the case of *Campbell-Kawananakoa*
v. *Campbell,* 152 Cal. 201, 92 Pac. 184 (1907), and ordered
argument thereon.

There can be no doubt that according to California
law the trust was void. "The trust attempted to be
created by the will was contrary to the laws of this state
prohibiting the suspension of the power of alienation for
a longer period than during the continuance of lives in
being at the time of the death of the testator, and was
therefore void in its creation as to real property situated
within this State." *Campbell-Kawananakoa* v. *Campbell,*
*supra,* holding that the St. James Hotel property
descended under the California intestate law to the
widow, who took one-third, and to the four daughters,
each of whom took one-sixth. On the argument of this
matter no contention was made to the contrary. Of course,
the California law applied to the California real property.

The question is whether the proceeds of this property
have become part of the trust by reason of certain events
transpiring after the death of the testator. If so, there
is the further question whether the guardian ad litem's
specifications of error in this matter have basis notwith-
standing the St. James Hotel was not part of the trust
at the inception. And there is the additional question
whether such addition to the corpus of the trust should
be taken into account in determining the right of those
represented by the guardian ad litem to restoration of
corpus. We ourselves have raised this last question for
the reason that, if corpus already has been reimbursed,
there is no warrant for a deduction from income at this
time and it would be a deviation from the will to order it.

It is significant that, in passing on the accounts of
the executors and executrix before the inception of the
trust, the Hawaiian probate court in a decision of June
12, 1903, took note of the California law, stating: "It

seems to me therefore that neither this property nor the proceeds thereof can properly be administered on under this will or be taken by the trustees. Even if it was the desire of the widow and children who are now of age the interests of the minor children should be protected."

Subsequently however on the basis of evidence taken the Hawaiian probate court concluded in a decision of July 25, 1904 that the property had been turned over to the trustees, and disallowed an item of $84.25 in the accounts of the executors and executrix on the ground that expenses in connection with this property should not appear in the probate accounts. But on appeal the executors and executrix obtained a reversal as to this item on the ground that the expenditure was "incurred in connection with property belonging to the estate." *Estate of Campbell*, 16 Haw. 512, 519 (1905). And at the inception of the trust on July 3, 1905 the St. James Hotel was included in the inventory of property turned over by the estate to the trustees.[58] Such actions repudiated the theory that the property already had been turned over to the trustees.

Pursuing a different theory in the California courts, the executors and executrix appeared in the guise of trustees and contended that the St. James Hotel had been sold to Alice Campbell in 1903 under a California court order and the proceeds distributed to them as trustees by decree of the California court, followed by a conveyance of the St. James Hotel from Alice Campbell to them, again as trustees. They were successful, at first, in demurring to the amended complaint of Princess Kawananakoa and the two heirs who then were minors, that is Muriel and Beatrice.[59] The three plaintiffs con-

---

[58] However, this decree of distribution under the law then existing did not settle the title to the real estate. See *Chun Ming* v. *Ho*, 45 Haw. 521, 535, 371 P.2d 379, 390.

[59] Muriel and Beatrice did not become of age until November, 1908 and October, 1912, respectively.

tended that these proceedings were in fraud of their rights as heirs. In 1907, the Supreme Court of California directed that the demurrer to the amended complaint be overruled on the ground said complaint was sufficient to show that the proceedings were a sham. *Campbell-Kawananakoa* v. *Campbell, supra,* 152 Cal. 201, 92 Pac. 184 (1907). We are informed by counsel for the trustees that according to the records of the trustees, after the remand special demurrers were filed and sustained. The complaint was further amended, answer filed and preparations made for trial, but in June, 1909, defendants obtained from counsel for plaintiffs a stipulation for dismissal of the suit and caused to be entered a judgment of dismissal.

The judgment of dismissal, as we are informed, did not state whether or not it was with prejudice. Whether it was in bar or not depends upon California law. Upon remand of the case the status of this dismissal judgment may be clarified. The materiality thereof will appear from what follows. In any event, the dismissal could not have been in bar of the rights of the youngest daughter, Beatrice, who did not become of age until 1912.

As to the proceedings prior to this dismissal judgment we note that under the decisions of this court the trust had its inception July 3, 1905 when the probate estate was closed, and not before. *Campbell-Parker* v. *Campbell-Parker,* 18 Haw. 34 (1906), *Campbell-Parker* v. *Campbell-Parker, supra,* 18 Haw. 342 (1907), *aff'd sub nom Hawaiian Trust Co.* v. *Von Holt,* 216 U.S. 367. As above noted, this was specifically held as to the St. James Hotel property, *Estate of Campbell, supra,* 16 Haw. at 519 (1905). So, while it is evident that there was a purpose to convert the California real property into a chose in action and distribute it to the trustees in California in 1903 in reliance on the law of Hawaii as the domiciliary jurisdiction[60] it has been adjudicated here that the trust

---

[60] See 11 Am. Jur., *Conflict of Laws,* § 95.

did not exist at that time. In 1905 when the trust had its inception the trusteees held California land, and under California law the trust was void. The trust was merely a resulting trust for the heirs, the widow and daughters. See 54 Am. Jur., *Trusts,* § 200; Restatement, *Trusts,* §§ 411, 422g (2d ed.).

On December 22, 1915 the then trustees petitioned the circuit judge at chambers for authority to sell the California real estate. This petition was filed in Equity No. 1661, a 1909 proceeding for the appointment of a successor trustee. No process was issued on, or guardian ad litem appointed with respect to, the 1915 petition. It recited that "the beneficiaries under the said trust have agreed and consented to the sale * * *." This proceeding cannot have amounted to an adjudication of the title of the property.

When the property was sold in 1916 and the proceeds invested by the trustees under the jurisdiction of the Hawaiian court that did not change the beneficial ownership of the property as determined in the first place under California law. *Cf.,* Restatement, *Conflicts,* § 260; *Dobbins* v. *Martin Buick Co.,* 216 Ark. 861, 227 S.W.2d 620; *Pruitt Truck & Implement Co.* v. *Ferguson,* 216 Ark. 848, 227 S.W.2d 944. Hence, at this stage, the determinative point was the effect of the 1909 dismissal judgment filed in the California court.

However, when the accounts were filed for settlement in 1951 thirty-five years had passed during which the property so brought within this jurisdiction was administered as part of the trust created by the will of James Campbell. The question of laches also must be considered. See Restatement, *Trusts,* §§ 219, 409 (2d ed.).

Until death, each of the heirs, the widow and daughters, received the income of the property just as she would have received it had it been recognized that as to this particular asset the trust was merely a resulting trust.

After the death of the widow each of the daughters received one-fourth of the income, *i.e.,* more than her original one-sixth share. The surviving two daughters have continued to receive such income. *Cf., Glover* v. *Waltham Laundry Co.,* 235 Mass. 330, 127 N.E. 420, 424. No repudiation of their rights has occurred. As held in *Bishop Trust Co.* v. *Cooke Trust Co., supra,* 39 Haw. 641, 652, no question of the ownership of the corpus was presented while the widow and daughters lived and continued to receive the income, and even if a declaration of rights could have been obtained as in *Bishop Trust Co.* v. *Cooke Trust Co.,* it was not *required* to be obtained because there was no present injury. Hence, up to the time of the present proceedings no question of ownership of the corpus was presented while the original heirs lived. No question of laches could properly arise until a particular heir died and the question then would arise only as to the share of the deceased heir. See *Howe* v. *Howe,* 199 Mass. 598, 85 N.E. 945; *Crawford* v. *Hurst,* 299 Ill. 503, 132 N.E. 521, 524; *cf., Ishida* v. *Naumu,* 34 Haw. 363, 373.

The widow died October 31, 1908. Her estate never has asserted any right in the St. James Hotel property. She was one of the prime actors in the various endeavors to make this property part of the trust and her one-third share has long since become such. The proceeds of the 1916 sale of the St. James Hotel property amounted to $40,000, so the widow's one-third was $13,333.33. Any error in the administration of the trust on her part has been more than recompensed by this addition to the corpus of the trust.

Princess Abigail died April 12, 1945. Princess Abigail's estate likewise has asserted no right in the St. James Hotel property, and upon the assumption that the 1909 judgment was not in bar her one-sixth share, amounting to $6,666.67, became part of the testamentary

trust in the years ensuing after her death, upon application of the principle stated in *Yokochi* v. *Yoshimoto,* 44 Haw. 297, 353 P.2d 820, concerning analogy to the statute of limitations. To the extent of this amount the overdistribution of income to Princess Abigail has been recompensed unless her rights were foreclosed in 1909 before the overdistribution occurred. This in turn depends upon the effect of the dismissal judgment, to be determined upon remand.

Muriel Amalu died March 19, 1951, shortly before the present proceeding was commenced. But equitable relief is governed by the circumstances at the time of the decree (19 Am. Jur., *Equity, supra*) and applying that principle the same result follows as to the overdistribution of income to her. That is, her estate having made no claim to the proceeds of the St. James Hotel property her share has become part of the testamentary trust. To the extent of $6,666.67 the overdistribution of income to her has been recompensed, unless her rights were foreclosed in 1909 before the overdistribution occurred.

We now consider the cases of the surviving daughters, Alice Campbell and Beatrice Wrigley. As to Beatrice Wrigley, her share in the St. James Hotel property will, by these proceedings, be finally adjudicated part of the testamentary trust, with a resultant credit to her of $6,666.67 to be applied against the overdistribution of income to her; she could not have been foreclosed by the 1909 dismissal as she was a minor at the time. In the case of Alice Campbell no such credit can be applied. She was not one of those who sought to set aside the 1903 California decree. On the contrary she was instrumental in obtaining it. Her rights under the California intestate law were foreclosed before any substantial overdistribution of income occurred.

From what has been said it follows that the rights of the contingent beneficiaries represented by the guardian

ad litem in the present proceeding did not arise upon the death of the testator, and at least in part did not arise until after the property was sold. In any event the sale of the property was one of the discretionary matters as to which the guardian ad litem had the initial burden of overcoming the presumption of regularity and good faith of the trustees' actions. *Estate of Campbell, supra,* 42 Haw. 586, 607. The guardian ad litem points to the difficulty of managing the property, the unsatisfactory income picture, and the evidence gleaned from the accounts that it was shrinking in value right along. But it is impossible to say how much of this was due to the California earthquake of 1906 which damaged this property, requiring over $30,000 of repairs, and presumably damaged other property in the district and affected values generally. It also is impossible to say how much of the diminution in value was due to the confused state of the title. In this connection it is to be noted that whatever rights in this property the contingent beneficiaries have received it is more than they would have received had the property been permitted to descend to the heirs under the California intestate laws; the confused state of the title cannot be a cause of complaint on the part of the contingent beneficiaries. We find no justification for reversal of the trial court's finding that no abuse of discretion was shown. The guardian ad litem's specifications of error with respect to the St. James Hotel have not been sustained.

XIX. *LIABILITY OF PREDECESSOR TRUSTEES.* Finding 2 reads as follows:

"2. The Trustee petitioners John K. Clarke and James L. Coke died on December 29, 1951, and August 12, 1957, respectively. No evidence has been adduced that the present trustees permitted any breach of trust by their predecessors to continue, neglected to

compel their predecessors to turn over trust property, or neglected to take proper steps to redress any breach of trust."

This finding is specified as error in the brief of the guardian ad litem, Specification No. 4, but the specification only concerns the petitioning trustees Coke and Clarke. It assigns error:

"4. In finding that no evidence was adduced that the petitioning Trustees Coke and Clarke permitted any breach of trust by their predecessors in trust to continue, neglected to compel their predecessors to turn over trust property, or neglected to take proper steps to redress any breach of trust. (Finding 2)."

While this specification speaks of a finding as to the liability of the original petitioning trustees, Coke and Clarke, in our view there was no such finding; all that was said about them was in the first sentence of Finding 2, where the dates of their deaths were noted. However, Specification No. 36 assigns error:

"36. In refusing to find that each of the petitioning Trustees Clarke and Coke, during the respective times they were trustees in the period covered by this proceeding, permitted breaches of trust to continue, neglected to take proper steps to remedy or redress breaches of trust and committed or joined in such actions or omissions to act, as were found to exist by the lower court and, also, as are above specified."

The notice of cross-appeal was not served on the attorneys for the executors of the deceased petitioning trustees, Clarke and Coke, although the attorney for the Coke estate was served with the opening brief on the cross-appeal. As to the Clarke estate, the record is unclear as to whether the executor of this estate was before the court in this particular proceeding as distinguished from another one instituted by Alice Campbell under the same number, Equity No. 2388. Some appearances were

made in the present proceeding, but there was no order of substitution or claim filed as there was with respect to the Coke estate. In this court there has been no appearance on behalf of either estate. We will not pursue these matters. They may be clarified on the remand of the case. At this time we follow our holding in *Inter-Island Resorts* v. *Akahane,* 44 Haw. 93, 98, 352 P.2d 856, 46 Haw. 140, 377 P.2d 715, and decline to rule on the liability of predecessor trustees when, under the judgment of the court below, that question was not reached. The matter is one for the circuit judge to consider in the first instance upon remand of the case.

XX. *SUMMARY OF ADJUSTMENTS.*

In summary, we hold that:

1. There was overdistribution of income to all four life beneficiaries in the amount of $53,398.85, comprised of the following items:

| *Reference to Opinion* | *Subject Matter* | *Amount* |
|---|---|---|
| IV | Portions of fees of C. Davis, F. Thompson, Anderson, Marx, Wrenn & Jenks, Ehrlich & Ulrich, and the guardian ad litem, E-2388 | $ 5,250.00 |
| VII | Nugent cottages | 180.00 |
| VII | Waterhouse building | 3,981.81 |
| VIII | Old building at Kapahulu, pipe at Kapiolani Park | 315.00 |
| IX | Eucalyptus trees | 27.01 |
| IX | Timbering license | 250.00 |
| X | Loose surface rock or coral | 6,601.95 |
| X | Royalties in 1941, 1942, 1943, sale of rock, Hawaii Meat Co. lease | 30,736.03 |
| X | Other royalties, rock, etc. | 6,057.05 |
| | Subtotal | $53,398.85 |

2. In addition there was an overdistribution to Alice Campbell in the amount of $4,501.49, comprised of the following items:

| Reference to Opinion | Subject Matter | Amount |
|---|---|---|
| II | ¼ of $11 transcript fee........................$ | 2.75 |
| IV | Portion of attorneys' fee, E-2388...... | 1,750.00 |
| V | Portion of fees of trustees' attorneys, E-2998 ............................. | 2,500.00 |
| V | Expenses, E-2998 ............................. | 248.74 |
| | Subtotal..........................$ | 4,501.49 |

In the case of Alice Campbell, therefore, the amount to be withheld from 1959 income is reduced from $49,284.23 to $17,851.20 consisting in one-fourth of the items in paragraph 1 or $13,349.71, plus the items in this paragraph 2 in the amount of $4,501.49.

3. In the case of Beatrice Wrigley there was, in addition to the overdistribution of income resulting from the items noted in paragraph 1, an overdistribution of income in the amount of $1,502.73, comprised of the following items:

| Reference to Opinion | Subject Matter | Amount |
|---|---|---|
| II | ¼ of $11 transcript fee........................$ | 2.75 |
| IV | Portion of attorneys' fees, E-2388..... | 1,500.00 |
| | Subtotal..........................$ | 1,502.75 |

After application of a credit of $6,666.67 pursuant to Part XVIII of the opinion, the amount to be withheld from 1959 income of Beatrice Wrigley is reduced from $39,025.49 to $8,185.79 consisting in one-fourth of the items in paragraph 1, or $13,349.71 plus the items in this paragraph 3 in the amount of $1,502.75,

less the credit of $6,666.67 under Part XVIII of the opinion.

4. In the case of the Shingle descendants the amount to be withheld from income is reduced from $39,055.49 to the following amounts, which are to be withheld from 1959 income:

| Reference to Opinion | Subject Matter | Amount |
|---|---|---|
| II | ¼ of $11 transcript fee | $ 2.75 |
| II | Court costs | 30.00 |
| IV | $500 fee paid from corpus in Eq. No. 3501 to the attorney for M. M. Sutherland, A. S. King and F. C. Shingle, to be charged to the 1959 income of these beneficiaries, or such of them as still survive | 500.00 |
| | Subtotal | $ 532.75 |

5. In the case of the Kawananakoa descendants the amount to be withheld from income is reduced from $39,025.49 to $2.75, being one-fourth of the $11 transcript fee pursuant to Part II of the opinion.

6. This leaves unrecovered and for consideration on remand the overdistributions of income to Princess Abigail and Muriel Amalu, deceased, consisting as to each in one-fourth of the items in paragraph 1, or $13,349.71, subject to a possible credit in each instance of $6,666.67 under Part XVIII of the opinion, dependent upon determination on remand of the effect of the 1909 judgment dismissing the California suit.

The final result is that, subject to further reduction on remand in respect of the St. James Hotel, Part XVIII, the amount ordered restored to corpus is reduced from

$166,390.70 to $53,271.91, of which $26,699.42 cannot be withheld from income.

Affirmed in part and reversed in part. Remanded for further proceedings in accordance with this opinion.

*Frank D. Padgett* (*Robertson, Castle & Anthony* of counsel) for trustees-appellants, appellees, Alan S. Davis, M. L. Randolph and George M. Collins.

*Axel Ornelles* for Alice Kamokila Campbell, appellant, appellee.

*Richard E. Stifel* (*Anderson, Wrenn & Jenks* of counsel) for Beatrice C. Wrigley, Beatrice A. King, Frederick C. Shingle, Gilmer K. Shingle, James C. Shingle, Seymour Shingle, Muriel K. Sutherland and Louise K. Wilcox, appellants, appellees.

*Wilford D. Godbold* for Hawaiian Trust Co. and Hugh Howell, Executors of the Estate of Kapiolani C. Field, Deceased, and Liliuokalani K. Morris, appellants, appellees.

*Joseph V. Hodgson,* Guardian ad Litem, cross-appellant, appellee.

MIZUHA, J., WITH WHOM HAWKINS, CIRCUIT JUDGE CONCURS, WHILE JOINING THE OPINION OF THE COURT, DISSENTS FROM THE HOLDING THAT THE SUCCESSOR TRUSTEES HAVE A RIGHT TO APPEAL.

Although the trial judge found that "no evidence has been adduced that the present successor trustees (A. S. Davis, M. L. Randolph and George M. Collins, Findings of Fact No. 2) permitted any breach of trust by their predecessors to continue, neglected to compel their predecessors to turn over trust property, or neglected to take proper steps to redress any breach of trust," there is no specification of error on the part of the income beneficiaries or the contingent beneficiaries and remaindermen

relative to this finding. Hence, it may be assumed that to the date of judgment, June 29, 1959, the present successor trustees were not liable either in their personal or representative capacities.

As I see it, any possibility of personal liability on the part of the successor trustees in the future depends on their conduct after the disposition of this case by this court. A partial reversal which leaves a deficiency in the corpus of the trust must be made up from either the estates of the former trustees or from their bondsmen, if such were possible. There may be neglect for failure to act or act promptly after this court has spoken.

R.L.H. 1955, § 208-3 provides in part as follows:

"Appeals shall be allowed from all decisions, judgments, orders or decrees of circuit judges in chambers, to the supreme court, except in cases in which the appellant is entitled to appeal to a jury, whenever * * *."

In construing this section this court stated in *In re Victoria K. Ward,* 42 Haw. 60, 64-5:

"* * * From a casual reading of the wording of the statute it might appear that any party to a proceeding would have the right of appeal where the decision is adverse to the contentions of such party. However, our court, as well as the great majority of appellate courts, has added the requirement that the appellant must be an 'aggrieved party.' The words 'aggrieved party' mean that the appellant's property rights must be affected thereby, that mere emotional feelings of dissatisfaction at the decision of the trial judge are not sufficient. (*Hawaiian Trust Co.* v. *Holt,* 24 Haw. 212; *Castle* v. *Irwin,* 25 Haw. 807; *Pires* v. *Pires,* 29 Haw. 849.)"

This requirement that an appellant's property rights must be affected in order to be an aggrieved party is now abandoned by the main opinion which holds that trustees

in their representative capacities have a right to appeal when they could "anticipate that, should there be a reversal of the portion of the judgment directing the trustees to withhold part of the deficiency from these income beneficiaries but not a reversal of the determination itself," they would "be faced with the possibility of further litigation to obtain other redress for the deficiency by seeking payment from the estates or bondsmen of predecessor trustees."

I agree with the majority that a trustee may appeal if he has a potential liability. *Estate of Holt*, 42 Haw. 129; *Hawaiian Trust Co.* v. *Galbraith*, 22 Haw. 78. But that is not this case where the successor trustees have been absolved of all personal liability. There is a distinction between "bill of instructions" and "accounting of trustees," but this distinction has no bearing on the trustees' right of appeal. In the *Galbraith* case, *supra*, which the main opinion cites in support of this contention, this court said at page 82 that the trustee had a right to appeal, not because the lower court was passing "upon what had already been done" but because "* * * The enforcement of the decree would oblige *the trustee to make good to those children their portion of the annuity for the years 1908 to 1910 which had been divided among the other claimants.* We think that because the amount involved is small and may be recouped by the trustee from those to whom it was paid does not affect the result. Under the circumstances we hold that the trustee has an appealable interest." (Emphasis added.)

The judgment below involves property rights of the income beneficiaries and contingent beneficiaries and remaindermen. The successor trustees in their representative capacities who contend that the accounts are correct after the lower court found a deficiency in the corpus and charged it to the income beneficiaries, are now clearly

favoring the income beneficiaries as against contingent beneficiaries and remaindermen, who have an interest in the corpus of the trust. This court stated in *Castle* v. *Irwin*, 25 Haw. 807, 811-12 that "* * * The trustees should occupy a neutral and indifferent attitude in any controversy between the real parties in interest and clearly they ought not to be allowed to litigate the claim of one such interested party as against another such party. * * * With controversies which affect the individual interests alone of those who may be interested in their trust they have nothing to do and consequently cannot be aggrieved by a decree which affects those individual interests. See *Goldtree* v. *Thompson*, 83 Cal. 420." See also *In re Estate of Ena*, 30 Haw. 41.

After the judgment of the court below, the successor trustees were not affected one way or the other. It should be no concern of theirs that the deficiency in the corpus is now charged to the income beneficiaries. It is a controversy which affects the individual interests of the income beneficiaries and the contingent beneficiaries and remaindermen. By sustaining the successor trustees right to appeal, the main opinion now overrules *Castle* v. *Irwin*, 25 Haw. 807.

In determining the successor trustees' right to appeal, mere anticipation as to the holding of this court which may necessitate future litigation to recover in a different suit or suits is insufficient to extend to them the right to appeal. The analogy in the main opinion with reference to judgment n.o.v. is inapplicable here. The successor trustees will not be aggrieved by a partial reversal or complete reversal of the judgment below. Any further litigation that may result as a result of partial reversal will not be on the accounts that are being settled, but against former trustees or their bondsmen to recover deficiencies in the corpus which arose during their ad-

ministration of the trust. This court further stated in the Castle case, 25 Haw. 786 at page 792:

"* * * Only persons who have substantial grievances, that is to say, who are affected or prejudiced by the judgment or decree, ought to be heard in the appellate court. Judicial tribunals sit only for the determination of real controversies between parties who have a legal interest of at least technical sufficiency in the subject-matters embraced in the records of causes pending in courts. Merely abstract or moot questions will not be determined on appeal and feigned or fictitious appeals ought not to be tolerated. * * *"

The holding in the main opinion that the successor trustees' have a right to appeal assumes that there will be a partial reversal of the judgment below. This court found that the lower court erred in charging all of the deficiency to income beneficiaries, leaving a portion of the deficiency unaccounted for, but declined "to rule on the liability of the predecessor trustees, when under the judgment of the court below, that question was not reached," and concludes that "this question may be clarified on the remand of the case." As a result the successor trustees now have a duty to recover this partial deficiency from others. Consequently, if at the outset the successor trustees, in their judgment felt that further litigation was unnecessary and that they should rest their case on the correctness of the predecessors' accounts they are aggrieved parties and entitled to appeal from the judgment below. This deduction leaves unanswered, the position of this court as to the successor trustees' right to appeal in the event this court affirmed the judgment below and terminated litigation on all of the issues raised by the income beneficiaries on this appeal, the same judgment which the successor trustees now seek to reverse by their appeal.

I cannot agree with a decision that permits successor

trustees who disagree with the judgment of the court below as to the correctness of their predecessors' accounts, and who merely anticipate the necessity of further litigation, (although it is their duty to litigate with others to recover any deficiency in corpus after this court has spoken) to fall into the category of aggrieved parties with the right to appeal despite the absence of any personal liability, and ignores the rule that successor trustees must remain neutral in any controversy between real parties in interest. *Castle* v. *Irwin,* 25 Haw. 807.